FILED
2013 Feb-28  PM 01:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **RESA WITT, *et al.*,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-11-S-1031-NW** |
| | ) | |
| **FRANKLIN COUNTY BOARD OF EDUCATION,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Plaintiffs, Resa Witt and Amy Moss, allege that their employer, the Franklin County Board of Education, engaged in gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000*e et seq.* ("Title VII").[1]  Plaintiffs claim that defendant passed them over for several promotions in favor of less-qualified male candidates, and that defendant terminated Moss from her position as coach of the girls' varsity basketball team at Phil Campbell High School for conduct that did not result in the termination of male basketball coaches. Defendant moved for summary judgment, and to strike portions of plaintiffs' evidentiary submissions in opposition to summary judgment.[2]  Upon consideration of the motions, briefs, and evidentiary submissions, the motion to strike will be granted

---

[1] Doc. no. 1.

[2] Doc. no. 15; doc. no. 25.

in part and denied in part, and the motion for summary judgment will be granted.

## I. MOTION TO STRIKE

Defendant asks the court to strike nineteen documents from plaintiffs' evidentiary submissions: ten affidavits or declarations;[3] six letters or notes;[4] and three Facebook message exchanges.[5]  Defendant bases its motion on plaintiffs' failure to disclose those exhibits, or the witnesses who created them, in either their initial disclosures or during discovery.[6]  Plaintiffs concede that thirteen of the documents are due to be stricken.[7]  Therefore, the court will disregard those documents in its analysis of the motions to strike and for summary judgment.

Even though three more documents — *i.e.*, Facebook messages from Wes Borden, Wade Berryman, and Riley Hughes — are classic hearsay, plaintiffs could reduce their substance to admissible form at trial by calling the authors of the

---

[3] The Declaration of "J.R.," and the Affidavits of Chris Latham, Jeremy Kimbrough, Walker Kennerly, William Holcomb, Terry Witt, Orvall Seay, Danny McClung, Riley Hughes, and William Roddy.  *See* doc. no. 25, at 1-2.

[4] Letters from William Smith, Tami Brown, Scotty Brown, and Notes from Jill Harris, Bridget DeVaney, and Libbey DeVaney.  *Id.* at 1.

[5] Messages posted on the "Facebook pages" of Wes Borden, Wade Berryman, and Riley Hughes.  *Id.*

[6] Doc. no. 15 ¶ 1.

[7] Plaintiffs consent to striking all of the following:  the Declaration of "J.R."; the Affidavits of Chris Latham, Jeremy Kimbrough, Walker Kennerly, Danny McClung, Riley Hughes, and William Roddy; the Letters from William Smith, Tami Brown, and Scotty Brown; and the Notes from Jill Harris, Bridget DeVaney, and Libbey DeVaney.  Doc. no. 28 (Response to Motion to Strike), at 8.  Plaintiffs *do not consent* to striking the affidavits of William Holcomb, Terry Witt, or Orval Seay.

messages as witnesses.  *See*, *e.g.*, *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996); *Catrett v. Johns-Manville Sales Corp.*, 826 F.3d 33, 37-38 (D.C. Cir. 1997); *Williams v. Borough of West Chester*, 891 F.2d 458, 466 (3d Cir. 1990).  Accordingly, and because the content of the messages is central to Amy Moss's wrongful termination claim, the messages will not be stricken.

Thus, three documents remain in dispute:  the affidavits of William Holcomb, Terry Witt, and Orval Seay.  Defendant argues that the documents should be stricken pursuant to Federal Rule of Civil Procedure 37(c)(1), which provides that, when a party fails to disclose evidence, "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  A failure to disclose is considered harmless "when there is no prejudice to the party entitled to the disclosure."  *Chapple v. State of Alabama*, 174 F.R.D. 698, 701 (M.D. Ala. 1997) (addressing a plaintiff's failure to disclose an expert witness).

When construing a motion to strike, the court must consider "(1) the importance of the testimony; (2) the reason for the [offering party's] failure to disclose the witness [or document] earlier; and (3) the prejudice to the opposing party if the witness [is] allowed to testify [or the document is taken into consideration when ruling upon a dispositive motion]."  *Bearint ex rel. Bearint v. Dorell Juvenile Group, Inc.*, 389 F.3d

3

1339, 1353 (11th Cir. 2004) (alterations supplied).  "The burden of establishing that a failure to disclose was substantially justified or harmless rests on the nondisclosing party." *Mitchell v. Ford Motor Co.*, 318 F. App'x 821, 825 (11th Cir. 2009) (quoting *Leathers v. Pfizer, Inc.*, 233 F.R.D. 687, 697 (N.D. Ga. 2006)).

A.    **Affidavit of William Holcomb**

Defendant objects to the affidavit of William Holcomb, the grandfather of one of the basketball players coached by plaintiff Amy Moss.  Although plaintiffs did not disclose Holcomb as a witness, defendant had ample notice that Holcomb might have information about the case, because it was counsel for *defendant* who introduced Holcomb's name during Moss's deposition.[8]  Given the unlikelihood that defendant was surprised or prejudiced by the non-disclosure of Holcomb, the court will not strike his affidavit.

B.    **Affidavit of Terry Witt**

Defendant next moves to strike the affidavit of Terry Witt,[9] the husband of plaintiff Resa Witt.  The affidavit contains three categories of information:  statements of fact that parallel the deposition testimony of Resa Witt;[10] statements of fact

---

[8] Doc. no. 17-3 (Deposition of Amy Moss), at 63-64.

[9] Doc. no. 23-11, at ECF 27-32 (Affidavit of Terry Edward Witt).

[10] *Compare* doc. no. 17-1 (Deposition of Resa Witt), at 185-86 (testifying that Witt rarely had disciplinary problems with students over the course of her career) *with* doc. no. 23-11 (Affidavit of Terry Edward Witt) ¶ 8 (stating that Witt has always been an effective disciplinarian).

regarding the emotional toll of the alleged discrimination on Resa Witt, an issue not implicated at the summary judgment stage;[11] and conclusory statements regarding the motivations of various school officials who are not parties to this action.[12]  Because Terry Witt supplies no new, relevant information, the court will strike his affidavit.

## C.   **Affidavit of Orval Seay**

Finally, defendant moves to strike the affidavit of Orval Seay, whose retirement created a job opening for which both plaintiffs applied, and which defendant filled by hiring Herbert Truelove.  During Truelove's deposition, plaintiffs' counsel asked Truelove who preceeded him, and Truelove named Seay as his predecessor.[13]  Seay's brief affidavit merely offers his state educational certifications and position with defendant.[14]

Seay's testimony is vital because the parties contest the issue of whether plaintiffs and Truelove had the proper certifications to fill Seay's position.  Further, any prejudice to defendant is slight because Seay's identify was known to defendant: Seay was the only employee to hold the contested position during his period of employment.  Thus, plaintiffs' failure to disclose Seay as a witness was harmless, and

---

[11] *See id.* ¶¶ 2-5, 13-15.

[12] *See id.* ¶ 9 ("Superintendent Gary Williams uses Principal Cindy Davis as a conduit to intimidate and harass [Witt].  Apparently, Principal Davis is happy to oblige.") (alteration supplied).

[13] Doc. no. 17-7 (Deposition of Ruie Herbert Truelove), at 21-22.

[14] *See generally* doc. no. 23-15 (Affidavit of Orval L. Seay).

his affidavit will not be stricken.

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).[15] In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*). Even so, "an inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983). Moreover,

---

[15] Rule 56 was amended, effective December 1, 2010, in conjunction with a general overhaul of the Federal Rules of Civil Procedure. The Advisory Committee was careful to note, however, that the changes "will not affect continuing development of the decisional law construing and applying these phrases." Adv. Comm. Notes to Fed. R. Civ. P. 56 (2010 Amends.). Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

> [t]he mere existence of some factual dispute will not defeat summary
> judgment unless that factual dispute is material to an issue affecting the
> outcome of the case.  The relevant rules of substantive law dictate the
> materiality of a disputed fact.  A genuine issue of material fact does not
> exist unless there is sufficient evidence favoring the nonmoving party for
> a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023; s*ee also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242,
251-52 (1986).

### III.  FACTUAL BACKGROUND

Defendant, the Franklin County Board of Education ("the Board"), is a public
school system in the State of Alabama.  The Board manages all of the schools in
Franklin County, except those that are part of the Russellville City system.  The Board
has five elected members, all of whom are male.[16]  The chief executive of the Board
is the Superintendent, who is elected to a four-year term and reports to the Board.[17]

The current Superintendent is Gary Williams, who was elected in 2008.[18]
Williams was preceded by Bill Moss, the father-in-law of plaintiff Amy Moss, who
was first elected in 2000, and served two consecutive terms.[19]  Gary Williams served
as Assistant Superintendent during Bill Moss's tenure, and the Moss family supported

---

[16] Doc. no. 17-5 (Deposition of Gary Williams), at 33.

[17] *See id.* at 25.

[18] *Id.*

[19] *Id.*

7

Williams's 2008 campaign.[20]

## A.      Plaintiffs' Education and Experience

Plaintiffs, Amy Moss and Resa Witt, are both employees in the Franklin County School System.  Moss primarily teaches Physical Education ("P.E.") classes, and Witt primarily teaches mathematics classes.[21]  Both plaintiffs teach at Phil Campbell High School.[22]

### 1.      Amy Moss

Amy Moss's husband, Bart Moss, teaches history at Tharptown High School, and his father, Bill Moss, is the former Superintendent of the Franklin County School System.[23]  Amy Moss holds a bachelor's degree in physical education and health education, a master's degree in educational leadership, and an educational specialist degree.[24]  She has received two Leadership Certificates as an Educational Administrator for the "P-12" grade levels.[25]  She also has two Professional Certificates:  one in Physical Education for the "P-12" grade levels, and one in Health

---

[20] *See id.* at 53, 102-03.

[21] Doc. no. 17-3 (Deposition of Amy Moss), at 25; doc. no. 17-1 (Deposition of Resa Witt), at 22-23.

[22] Doc. no. 17-3 (Deposition of Amy Moss), at 24-25; doc. no. 17-1 (Deposition of Resa Witt), at 22.

[23] Doc. no. 17-3 (Deposition of Amy Moss), at 10-11, 15.

[24] *Id.* at 11-12; doc. no. 23-2 (Affidavit of Amy Moss) ¶ 35.

[25] Doc. no. 23-17 (Certificates), at ECF 3 (Amy Moss Certificate Details).  Although they have the same title, the two Leadership Certificates are distinguished by the educational background required to qualify for each.

Education for the "7-12" grade levels.[26]

Moss began her educational career as a substitute teacher in the Lauderdale County system during the 1997-98 academic year.[27]  She was officially hired as a full-time teacher of Physical Education and Health in February of 1998, but her employment was not renewed when a former teacher expressed a desire to return to teaching those classes.[28]  She then took a job in the Haleyville City system teaching Physical Education and coaching girls' junior high school sports, including volleyball, softball, basketball, and track.[29]

Despite the fact that Moss remained at Haleyville for seven years and attained tenure, she left Haleyville for Phil Campbell High School after the 2004-05 school year in order to coach its girls' varsity basketball team.[30]  Since then, she has primarily has taught Physical Education for grades 7-12, although she also began teaching two Health classes during the 2010-11 school year, and a "basic literacy class" for eighth grade students during the 2011-12 school year.[31]  Those changes in Moss's schedule have not resulted in her teaching a greater number of classes or hours.[32]

---

[26] *Id.*

[27] Doc. no. 17-3 (Deposition of Amy Moss), at 19-20.

[28] *Id.* at 20-21.

[29] *Id.* at 22.

[30] *Id.* at 23; *see also* doc. no. 23-2 (Affidavit of Amy Moss) ¶¶ 2-3.

[31] Doc. no. 17-3 (Deposition of Amy Moss), at 25.

[32] *Id.* at 26.

## 2.    Resa Witt

Resa Witt holds a bachelor's degree in mathematics and physical education, a master's degree in mathematics education and educational administration, and an educational specialist degree, and is currently pursuing a doctoral degree in educational leadership.[33]    Like Amy Moss, Witt has received two Leadership Certificates as an Educational Administrator for grades "P-12."[34]  She also has two Professional Certificates in Mathematics for grades "7-12," a Professional Certificate in Physical Education for grades "P-12," and a "Highly-Qualified Teacher Eligibility" certificate in Mathematics for grades "7-12."[35]

Witt began her teaching career during the 1994-95 academic year at a middle school in Tishomingo, Mississippi.[36]  Having spent three years at Tishomingo teaching mathematics and "computer-discovery" courses, Witt left that school system after the 1997-98 school year to take her current job as a mathematics teacher at Phil Campbell High School.[37]  In addition to mathematics, she taught "career classes" for "two or three years" early in her employment with the Board.[38]  At some point, she also taught

[33] Doc. no. 17-1 (Deposition of Resa Witt), at 13-16.

[34] Doc. no. 23-17 (Certificates), at ECF 6 (Resa Witt Certificate Details).

[35] *Id.*  As with the Educational Administrator certificates that Moss and Witt both hold, the two identically-named mathematics certificates are distinguished by the educational level required to obtain them.

[36] Doc. no. 17-1 (Deposition of Resa Witt), at 20-21.

[37] *Id.* at 21-22.

[38] *Id.* at 23.

a history class.[39]   The mathematics courses she now teaches include Algebra and Geometry.[40]

## B.   Amy Moss's Tenure as Girls' Basketball Coach at Phil Campbell

Moss initially served as head coach for both the Phil Campbell High School girls' varsity basketball team, and its girls' junior high school basketball team, but she relinquished control of the junior high team to two of her former players in 2009.[41] Moss also coached the girls' track team.[42]

When Moss took over the girls' basketball teams in 2005, the teams were struggling, but under her guidance, they enjoyed greater success.[43]   Some of that improvement may be attributable to Moss's offseason conditioning program:  she required her basketball players to run track in the spring, even if they also participated in another sport during that season.[44]

During Moss's tenure as girls' basketball coach, she was involved in several incidents with players, students, and parents.   The details of the incidents are in dispute.   The Board produced statements of numerous witnesses alleging that Moss

---

[39] *Id.* at 24.

[40] *Id.* at 24-25.

[41] Doc. no. 23-2 (Affidavit of Amy Moss) ¶ 2.

[42] *Id.*

[43] *Id.* ¶ 3.

[44] Doc. no. 17-3 (Deposition of Amy Moss), at 30.

yelled and used profanity, but those accounts were compiled during the course of the litigation, and not recorded contemporaneously with the events.[45]  Moss testified that the witnesses whose accounts conflicted with her own must have been lying.[46]  In accordance with the summary judgment standard, the facts set forth below reflect Moss's version.[47]

### 1.     Argument with a player's father

When Moss's team played in a Thanksgiving Day tournament at Russellville in 2006, one of the players, who is identified by her initials, "S.J.," received limited playing time.[48]  After the game, S.J.'s father confronted Moss, because he was angry that his daughter had not played more.[49]  Moss explained that S.J. "played about as much as she was going to play . . . throughout the year" due to the fact she was always "the last one off the bench."[50]

S.J.'s father said that he did not think that was fair, because S.J. put in the same

---

[45] *See* doc. no. 17-9 (Affidavit of Gary Williams), Ex. B (Statements Regarding Amy Moss), at ECF 5-41.

[46] Doc. no. 17-3 (Deposition of Amy Moss), at 49, 52-54, 56, 83, 174.

[47] Moss acknowledged that upon termination, she was accused of some of the behavior that she denied at her deposition.  *Id*. at 33; doc. no. 23-2 (Affidavit of Amy Moss) ¶¶ 5-6.  There is no dispute that the Board received complaints about Moss's behavior and, because the Board's receipt of such complaints (whether true or not) bears upon its reasons for terminating her employment, the court will take note of such allegations.

[48] Doc. no. 17-3 (Deposition of Amy Moss), at 81.

[49] *Id.* at 81-82.

[50] *Id.* at 82.

amount of time and effort in preparing for games as did the other players.[51]  Moss responded that, "if he didn't like it, [S.J.] didn't have to play."[52]  Moss gestured at S.J.'s father and reiterated that she "did not have to explain anything" to him or to his daughter.[53]  The following day, a Sunday, S.J. quit the team, and turned in her uniform.[54]

When S.J. arrived at her Physical Education class on Monday, Moss, the teacher, told her that she needed to have her schedule changed, because that Physical Education class was only for athletes, and S.J. had lost her eligibility to take the class by quitting the team.[55]  However, S.J. needed to take a Physical Education class in order to graduate, and her removal from the course required her to rearrange her class schedule in order to take a P.E. class during a different period.[56]

## 2.    Dismissal of a player

During another incident, Moss testified that she dismissed a player, who is identified by her initials, "J.H.," from the junior high team as a result of the player's

---

[51] *Id.*

[52] *Id.* (alteration supplied).

[53] Doc. no. 17-9 (Affidavit of Gary Williams), Ex. B (hereafter "Statements Regarding Amy Moss"), at ECF 22 (Statement of S.J.'s Parents); doc. no. 16 (Brief in Support of Summary Judgment), at "Defendant's Undisputed Facts" ¶ 10 (hereafter "Defendant's Facts").  The court will cite to the parties' statements of fact, to the extent that those statements are undisputed.

[54] Doc. no. 17-3 (Deposition of Amy Moss), at 84; doc. no. 17-5 (Deposition of Gary Williams), at 94.

[55] Doc. no. 17-3 (Deposition of Amy Moss), at 84-85.

[56] Doc. no. 17-5 (Deposition of Gary Williams), at 94-95.

behavioral issues.[57]  Moss also told J.H. that she would never play for Phil Campbell

High School again.[58]

Before dismissing J.H. from the team, Moss allegedly sought the assistance of

J.H.'s parents to address the behavioral issues, but those efforts were apparently not

successful.[59]  In fact, on one occasion, J.H.'s mother caused a disruption at the school

gym, leading Moss to have the police remove her.[60]

### 3.    Player criticized for choice of high schools

East Franklin Junior High School students who complete the ninth grade have

the option of attending either Phil Campbell or Tharptown High School for grades ten

through twelve.[61]  One East Franklin ninth-grader, who is identified by her initials,

"K.M.,"[62] joined the Phil Campbell varsity basketball team near the end of the season,

---

[57] Doc. no. 17-3 (Deposition of Amy Moss), at 64.

[58] Defendant's Facts ¶ 14; doc. no. 17-5 (Deposition of Gary Williams), at 96-97.

[59] Doc. no. 17-3 (Deposition of Amy Moss), at 64; doc. no. 23-2 (Affidavit of Amy Moss) ¶¶ 21-22.

[60] Doc. no. 17-3 (Deposition of Amy Moss), at 64; doc. no. 23-2 (Affidavit of Amy Moss) ¶¶ 21-22.  Members of J.H.'s family complained to Superintendent Williams that, in addition to dismissing J.H. from the team, Moss had the team encircle her and tell her that she was responsible for losing a game.  Doc. no. 17-5 (Deposition of Gary Williams), at 96-97; Statements Regarding Amy Moss, at ECF 5-7 (Statement of J.H.'s Grandfather).  Moss was not confronted with this allegation until her dismissal.  *See* doc. no. 17-3 (Deposition of Amy Moss), at 66-67.

[61] *See* doc. no. 17-5 (Deposition of Gary Williams), at 23; doc. no. 17-3 (Deposition of Amy Moss), at 85-87; doc. no. 17-8 (Defendant's Answers to Interrogatories), at 6.

[62] The record is not clear on the last name of "K.M."  Because her grandmother's last name begins with the letter "M," the court will refer to the student as "K.M."  *See* Statements Regarding Amy Moss, at ECF 25-26 (Statement of K.M.'s Grandmother); doc. no. 17-3 (Deposition of Amy Moss), at 85-86.

and played with the team during its summer workouts.[63]   Before K.M. decided between Phil Campbell and Tharptown, Moss told K.M. and her family that they "should choose a school and go wherever was going to make them happy."[64]

Shortly before the school year began, however, Moss heard that K.M. planned to enroll at Tharptown, rather than Phil Campbell.[65]   Moss telephoned K.M. and told her that she "was letting her teammates down after she had played with us all summer because we had the potential to be pretty good."[66]   Moss testified that she had not spoken to K.M. since her enrollment at Tharptown,[67] but subsequently admitted to telling K.M. to "get the hell out of my face" during a basketball game at Red Bay High School.[68]

### 4.     Player called a liar

One of the Phil Campbell High School girls' basketball players became pregnant during the 2009-10 season.[69]   Although the player tried to hide her

---

[63] Doc. no. 17-3 (Deposition of Amy Moss), at 86.  Apparently, ninth-graders who are already varsity-caliber athletes may join either the Phil Campbell or Tharptown team while still enrolled at East Franklin, but are not then obligated to attend that same high school for the next three years.  Such appears to have been the case with K.M.

[64] *Id.* at 87.

[65] *Id.*

[66] *Id.*

[67] *Id.* at 88.

[68] Defendant's Facts ¶ 18; *see also* Statements Regarding Amy Moss, at ECF 25 (Statement of K.M.'s Grandmother).  Moss's presence at a Red Bay-Tharptown game is presumably explained by the fact that her husband coaches the Tharptown Junior High School boys' basketball team.

[69] Doc. no. 17-3 (Deposition of Amy Moss), at 38-39.

pregnancy, it eventually became obvious to Moss and others.[70]  Moss asked another

player, identified as "T.M.," how long she had known about the pregnancy.[71]  T.M.

told Moss that she found out when Moss did.[72]  At roughly the same point in the

season, Moss removed T.M. from the starting lineup.[73]  With T.M. on the bench, the

team's record improved from 2-7 to 14-14.[74]

T.M. alleged that Moss accused her of knowing about the pregnancy, and called

T.M. a "liar" for not informing Moss earlier.[75]  T.M.'s mother wanted a meeting with

Moss to discuss the way she treated her daughter.[76]  When Moss learned of T.M.'s

mother's wishes from another player's parent, Moss contacted Superintendent

Williams, who told her not to worry about T.M.'s mother, because her complaint

simply concerned her daughter's playing time.[77]

### 5.    Scoresheet incident

During the 2006-07 season, the mother of junior high school player identified

---

[70] *See* doc. no. 23-4 (Affidavit of Joseph Bartlette Moss) ¶ 15 n.1 ("Everyone suspected S.G. was pregnant because her physical condition was becoming increasingly obvious.").

[71] Doc. no. 17-3 (Deposition of Amy Moss), at 39.

[72] *Id.*

[73] *See id.* at 39-40.

[74] *Id.* at 40.

[75] Statements Regarding Amy Moss, at ECF 13 (Statement of T.M.'s Mother).

[76] *See id.*; doc. no. 17-5 (Deposition of Gary Williams), at 105-07.

[77] Doc. no. 23-2 (Affidavit of Amy Moss) ¶ 16; *see* doc. no. 17-3 (Deposition of Amy Moss), at 40 ("I have never spoke[n] to [T.M.'s mother].") (alterations supplied); *id.* at 43-44.

as "S.H." kept a personal scoresheet during each game.[78]  Although that practice did

not "upset" Moss, she admitted that she thought it was "selfish" for a parent to keep

a scoresheet.[79]  After one game, which Phil Campbell High School lost by a score of

41-7, Moss obliquely addressed the issue of the personal scoresheet in a post-game

speech to the team by asking her players, "[A]re we getting better as a team or are we

worried about ourselves?"[80]

### 6.    The "Senior Night" incident

The Phil Campbell High School varsity girls' basketball team played its final

home game of the 2009-10 season on January 28, 2010.[81]  Like many high schools,

Phil Campbell designated that game as "Senior Night," in recognition of those players

who were playing their final home game.[82]  Although there were a number of seniors

on the team, the players who typically started games and played the most were

sophomores.[83]  Phil Campbell hosted Shoals Christian High School and, with the

---

[78] Doc. no. 17-3 (Deposition of Amy Moss), at 49; Statements Regarding Amy Moss, at ECF 20 (Statement of S.H.'s Father); Statements Regarding Amy Moss, at ECF 23 (Statement of S.H.'s Mother).

[79] Doc. no. 17-3 (Deposition of Amy Moss), at 49.

[80] *Id.* at 49-52 (alteration supplied); *see also* Statements Regarding Amy Moss, at ECF 20 (Statement of S.H.'s Father) (stating the score of the game); Statements Regarding Amy Moss, at ECF 23 (Statement of S.H.'s Mother) (same).

[81] Doc. no. 17-3 (Deposition of Amy Moss), at 34; doc. no. 23-2 (Affidavit of Amy Moss) ¶ 12.

[82] Doc. no. 23-2 (Affidavit of Amy Moss) ¶ 12.

[83] *Id.*

sophomores on the floor, built a 25-point lead.[84]   Moss then inserted her reserve players, including several seniors.[85]   The Phil Campbell bench players were not as effective as the starters, and Shoals Christian cut into Phil Campbell's lead.[86]   Moss reinserted her underclassmen starters in an effort to win the game.[87]

When the Phil Campbell starters checked back into the game, two senior players still had not played.[88]   The Phil Campbell student section, which was seated behind home bench, began to chant, "Seniors! Seniors!"[89]   Moss turned to the two seniors who had yet to play and told them to quiet the crowd, or they would never play again.[90]   It is not clear whether the players attempted to quiet the crowd, but the student section did not stop chanting.  Moss then faced the student section and told the spectators to "shut up!"[91]

### 7.   Termination as girls' basketball coach

---

[84] *Id.*

[85] *Id.*

[86] *Id*.

[87] *Id.*  The record does not include an statement of the game's final outcome.

[88] *See* Defendant's Facts ¶¶ 22-23.

[89] *Id.*  Moss characterized the chanting as the student section's "heckling" of her.  Doc. no. 23-2 (Affidavit of Amy Moss) ¶ 13.

[90] Defendant's Facts ¶ 23.  Although Senior Night was the last home game of the year, Phil Campbell had at least one more regular season game, and participated in an area tournament.  Doc. no. 17-3 (Deposition of Amy Moss), at 31.

[91] Doc. no. 23-2 (Affidavit of Amy Moss) ¶ 13; doc. no. 17-3 (Deposition of Amy Moss), at 35.  Numerous witnesses alleged that Moss actually said "Shut the hell up," which was the version of the incident recounted to Superintendent Williams the next day.  *See* Statements Regarding Amy Moss; doc. no. 17-5 (Deposition of Gary Williams), at 103-04.

The morning after the Senior Night game, Superintendent Williams stopped at a convenience store on his way to his office.[92]  Several people who were eating breakfast there asked Williams if he was aware of what had occurred during the game the night before, told him that Moss had yelled at the student section to "shut the hell up," and asked how much longer he was going to "put up with her shit."[93]  Williams also received telephone calls complaining about Moss's behavior at the game.[94] About two weeks later, Williams — apparently as a courtesy — met with his predecessor and Amy Moss's father-in-law, Bill Moss, and told him that he planned to ask Amy Moss to resign.[95]

After the conclusion of the basketball season, there was friction between Moss and Darit Riddle, the assistant principal and coach of the Phil Campbell High School girls' softball team.  Moss required her basketball players to participate in track during the spring, a sport that Moss also coached.[96]  Even so, Riddle told the members of the softball team who also played basketball that they were not obligated to run track.[97] Superintendent Williams, Phil Campbell Principal Cindy Davis, and Athletic Director Kelly Kiser held a meeting with both coaches to resolve the issue on March 10,

---

[92] Defendant's Facts ¶ 25; doc. no. 17-5 (Deposition of Gary Williams), at 103.

[93] Doc. no. 17-5 (Deposition of Gary Williams), at 103; *see also* Defendant's Facts ¶ 26.

[94] Doc. no. 17-5 (Deposition of Gary Williams), at 108.

[95] *Id.* at 108-09.

[96] Doc. no. 17-3 (Deposition of Amy Moss), at 30.

[97] *Id.*

2010.[98]   Williams allowed Moss to require basketball players to participate in track, even while they were actively participating in the softball program.[99]

After the question of participation in track was settled, Riddle was dismissed from the meeting.[100]   Williams then told Moss that, after praying over the issue and meeting with Bill Moss, he had reached a difficult decision.[101]   Before indicating what the decision was, "[Williams] started to rattle off everything [that he thought Amy Moss had done wrong] in the last four years."[102]   According to Williams, parents had complained that Moss had told the crowd to "shut the hell up" at the Senior Night game.[103]   Although Moss argued that she had actually said "'shut up' with a pause in between," Williams did not give her a chance to explain, and insisted that she had said "shut the hell up."[104]

In addition to the Senior Night incident, Williams noted "numerous complaints about [Moss's] coaching and [] teaching."[105]   Williams accused Moss of refusing to meet with the mother of the player identified as "T.M.," and of denying playing time

---

[98] *Id.* at 31-32.

[99] *Id.* at 32.

[100] *Id.* at 32-33.

[101] *Id.* at 33.

[102] Doc. no. 17-3 (Deposition of Amy Moss), at 33 (alterations suppled); *see also* doc. no. 23-2 (Affidavit of Amy Moss) ¶ 5.

[103] Doc. no. 17-3 (Deposition of Amy Moss), at 33-34.

[104] *Id.* at 36; *see also* doc. no. 23-2 (Affidavit of Amy Moss) ¶ 13.

[105] Doc. no. 23-2 (Affidavit of Amy Moss) ¶ 6 (alterations supplied).

to several other players, without affording Moss an opportunity to rebut those allegations.[106]

Moss asked Williams if he was requesting her resignation, and Williams said that he was.[107]  Moss then asked Athletic Director Kiser and Principal Davis if they agreed with Williams's recommendation that she resign.  Kiser responded that he did not, while Davis stated that she did not believe that she had any authority in the matter.[108]  Moss said that she would not resign, because male coaches had retained their positions in the wake of more significant incidents.[109]

At the next Board meeting on March 25, 2010, Williams recommended the termination of Moss as coach of the varsity girls' basketball team at Phil Campbell High School, and the Board voted 4-1 in favor of his recommendation.[110]  Williams issued a letter to Moss, informing her of the Board's decision, and stating that she was being terminated from "basketball (only)."[111]

### 8.    Actions of other male coaches

#### a.    Darit Riddle

---

[106] *Id.*; doc. no. 17-3 (Deposition of Amy Moss), at 34.

[107] Doc. no. 23-2 (Affidavit of Amy Moss) ¶ 8.

[108] *Id.* ¶ 9.

[109] *Id.* ¶¶ 8-9.

[110] *Id.* ¶ 10; doc. no. 23 (Brief in Opposition to Summary Judgment), at Plaintiffs' Statement of Facts ¶ 37 (hereafter "Plaintiffs' Facts").

[111] Doc. no. 23-24 (Termination Letter); Plaintiffs' Facts ¶ 38.

Darit Riddle is an assistant principal at Phil Campbell High School who coaches the girls' softball team.[112]   During Moss's tenure as coach of the girls' varsity basketball team, Riddle coached the boys' basketball team, and after Moss's termination, he replaced Moss as coach of the girls' varsity basketball team.[113] Plaintiffs argue that Riddle retains his coaching positions, despite the following allegations of improper behavior.

### i.    Comment about a female player's breasts

During practice, Phil Campbell High School basketball players wear reversible uniforms that are black on one side and white on the other.[114]  The girls usually wear shirts under their uniforms, which allows them to reverse the uniforms in the gym without fear of exposure.[115]  In November of 2011, however, a player identified as "M.H." was not wearing a shirt under her uniform when she was asked to reverse it.[116] Riddle turned his back to the player so she could change, adding the words, "[i]t's nothing we haven't seen before."[117]  During his deposition, Riddle explained that his comment was a reference to an offseason team camp that was held in Pensacola,

---

[112] Doc. no. 23-26 (Deposition of Darit Riddle), at 7.

[113] *See id.*; doc. no. 17-3 (Deposition of Amy Moss), at 89; doc. no. 23-26 (Deposition of Darit Riddle), at 11.

[114] *Id.* at 15.

[115] *Id.*

[116] *Id.* at 15-16.

[117] *Id.* at 16.

Florida, at which the players, coaches, and parents spent time at the beach, and the players "wore a bikini or something relatively skimpy."[118]

The following Sunday, a different Phil Campbell player met Superintendent Williams at church, and told him that Riddle had actually said, "That's nothing I've never seen before.  Somebody give her some Band-Aids to put over those mosquito bites," in reference to M.H.'s nipples.[119]  Williams met with Riddle the next day and told him that Williams "thought his alleged language was inappropriate. . . [that] that didn't need to be happening, and [that the Board] couldn't put up with that type of behavior."[120]  Riddle told Williams that he did not comment specifically on M.H's nipples, but only referred to the fact that, while at the camp, "he had seen the girls in their bathing suits with bra-like tops on."[121]

Williams also spoke with M.H.'s mother, who "said [that] when she [first] heard [about Riddle's comment], she was a little bit upset about it; but by the time [Williams] had spoken with her, she wasn't."[122]  Williams did not speak with M.H. herself, because they attend the same church, and he did not want to embarrass her.[123] Although Riddle was issued a formal, written reprimand, Williams allowed Riddle to

---

[118] *Id.* at 16-18.

[119] Doc. no. 17-5 (Deposition of Gary Williams), at 39-40.

[120] *Id.* at 43-44 (alterations supplied).

[121] *Id.*

[122] *Id.* at 44 (alterations supplied).

[123] *Id.* at 45.

provide a written account of his version of the incident, and did not relieve Riddle of his coaching duties.[124]

### ii.    Dancing at the 2010 prom[125]

Riddle was photographed dancing with students and a fellow teacher at Phil Campbell High School's prom in the spring of 2010.[126]  The photograph depicts four individuals dancing in a line:   Phil Campbell teacher Amy Gunderman; an unidentified, female student with her back to Riddle's chest; Riddle; and "R.C.," a male student with his hips pressed to Riddle's buttocks.[127]  While dancing, Riddle was described as engaging in a "humping" motion.[128]  Riddle testified that he was not aware of any previous criticism regarding his conduct.[129]  Superintendent Williams

---

[124] Doc. no. 23-26 (Deposition of Darit Riddle), at 20-21.

[125] Moss also raises two other "incidents" involving Riddle:  rumors that he was "being friendly with" a female student early in his career; and allegations that he called his players "stupid" at practice.  *See id.* at 22; doc. no. 17-3 (Deposition of Amy Moss), at 92-93.  According to Riddle's uncontroverted testimony, the unsubstantiated rumors about him were not true.  Doc. no. 23-26 (Deposition of Darit Riddle), at 22.  Further, Moss admitted that she had no personal knowledge of Riddle calling his players "stupid"; she only heard about it from unnamed parents, players, and former assistant coaches.  Doc. no. 17-3 (Deposition of Amy Moss), at 92-93.  Because the "evidence" of those incidents is supported by little more than Moss's self-serving hearsay testimony, the court will not consider them.

[126] *See* doc. no. 23-26 (Deposition of Darit Riddle)*,* at 46-49; doc. no. 17-3 (Deposition of Amy Moss), at 245-56; doc. no. 17-5 (Deposition of Gary Williams), at 47-48; *see also* doc. no. 17-3 (Deposition of Amy Moss), Ex. 21 (Photograph of Spring 2010 Prom), at ECF 45; doc. no. 17-2 (Exhibits to Deposition of Resa Witt), Ex. 33 (Screenshot of Tina King's Facebook Page), at ECF 65.  The copy of the photograph provided to the court is grainy, dark, and depicts only shadowy figures.

[127] Doc. no. 23-26 (Deposition of Darit Riddle), at 47-49; doc. no. 17-3 (Deposition of Amy Moss), at 245-46.

[128] Doc. no. 17-3 (Deposition of Amy Moss), at 248-52.

[129] Doc. no. 23-26 (Deposition of Darit Riddle), at 49.

testified that he had not seen the photograph prior to this litigation; in any event, he did not think that it portrayed anything improper, and noted that teachers danced at every prom he had ever attended.[130]

### b.   "Bo" Culver

"Bo" Culver, the head football coach at Phil Campbell High School, once called a player "brain dead and dumb as a bag of hammers" after a poorly executed play.[131] When confronted by the player's father, Culver admitted to making the comment, but maintained that he did not mean it as an insult.[132]   The player's father also called Superintendent Williams, who confirmed the incident with Culver, but took no disciplinary action.[133]

### c.   Greg Watson[134]

Greg Watson is the boys' basketball coach at Belgreen High School in Franklin

---

[130] Doc. no. 17-5 (Deposition of Gary Williams), at 47-49.

[131] Doc. no. 17-3 (Deposition of Amy Moss), at 173-74, 354-55; *see* doc. no. 17-5 (Deposition of Gary Williams), at 123-24.

[132] Doc. no. 17-3 (Deposition of Amy Moss), at 354-55; *see* doc. no. 17-5 (Deposition of Gary Williams), at 123-24..

[133] Doc. no. 17-5 (Deposition of Gary Williams), at 123-24.

[134] The record is not clear regarding the correct name of "Greg Watson."  The now-stricken affidavit of Riley Hughes refers to that individual as "Greg Watson," s*ee* doc. no. 23-25 ¶ 2, as does plaintiffs' response brief.  Doc. no. 23, at 16.  However, in their depositions, Amy Moss and Superintendent Williams refer to that individual only as "Coach Watkins."  *See* doc. no. 17-3 (Deposition of Amy Moss), at 157-60; doc. no. 17-5 (Deposition of Gary Williams), at 36-39.  In any event, Hughes, Moss, and Williams all refer to the same individual involved in the same incident.  The court refers to that individual as "Greg Watson" for convenience and consistency.

County.[135]  During a game between Belgreen and Tharptown High School, Belgreen's players began holding the ball on offense to prevent Tharptown from scoring.[136]  A player for Tharptown approached someone on Belgreen's team (either a player or Watson himself) and called the Belgreen tactics "chickenshit."[137]  Watson heard the statement and allegedly said that he would "whip [the student's] ass."[138]  After investigating the incident and interviewing both Watson and Tharptown's coach, Superintendent Williams was satisfied that Watson did not make the comment, and took no disciplinary action.[139]

## C.    The Transportation Director Vacancy

The Board posted an opening for the Transportation Director position on April 22, 2010.[140]  According to the "Subject and Personnel Codes" developed by the Alabama State Department of Education ("the Codes"), the Transportation Director

---

[135] *See* doc. no. 17-5 (Deposition of Gary Williams), at 36; doc. no. 17-3 (Deposition of Amy Moss), at 158.

[136] Doc. no. 23-4 (Affidavit of Bart Moss), Ex. A (Facebook Messages), at ECF 11 (Message from Wes Borden), 13 (Message from Riley Hughes).

[137] *Id.*; doc. no. 17-5 (Deposition of Gary Williams), at 37.

[138] *See* doc. no. 23-4 (Affidavit of Bart Moss), Ex. A (Facebook Messages), at ECF 11-13 (Messages from Wes Borden, Wade Berryman, and Riley Hughes); doc. no. 17-3 (Deposition of Amy Moss), at 158-59.

[139] Doc. no. 17-5 (Deposition of Gary Williams), at 36-39.

[140] Plaintiffs' Facts ¶ 22; doc. no. 17-2 (Exhibits to Deposition of Resa Witt), Ex. 3 (Transportation Director Posting), at ECF 9.  The parties refer to the position as "Transportation Director," although the job posting calls the position "Transportation Supervisor."  Because the difference is not consequential, the court will use the parties' terminology.

is "responsible for supervising the transportation of students to and from school."[141] The Codes required that an applicant have at least one of several, enumerated educational certificates.[142]   An administrative degree was a prerequisite for the position, and administrative experience was preferred.[143]   The Board listed several duties associated with the position, such as:   developing and administering a transportation program for the county;  preparing bus routes;  and supervising all transportation personnel.[144]

Moss, Witt, and Donald Borden (who was also serving as Assistant Superintendent of the County School System) applied for the position.[145]  All three candidates had the proper certification and education, although plaintiffs had more education than Borden, and Borden had more administrative experience than plaintiffs.[146]  Twelve years earlier, however, in 1998, the Board had fired Borden as principal of Phil Campbell High School for allegedly cheating on a teacher-evaluation

---

[141] Doc. no. 17-10 (Affidavit of Sarah Justiss), Ex. A (Excerpts of "Subject and Personnel Codes"), at ECF 9.

[142] *Id.*; *see also* Plaintiffs' Facts ¶ 28.

[143] Plaintiff's Facts ¶ 28.

[144] Doc. no. 23-19 (Job Postings and Descriptions of Various Positions), at ECF 7 (Job Description for Transportation Director).

[145] Doc. no. 17-3 (Deposition of Amy Moss), at 102-03; doc. no. 17-5 (Deposition of Gary Williams), at 70; doc. no. 17-6 (Deposition of Donald Borden), at 21; doc. no. 17-1 (Deposition of Resa Witt), at 34-35.

[146] Plaintiffs' Facts ¶ 28.

training course.[147]  After consultation with officials at the Alabama State Department of Education in May of 2010, the Board assigned the duties of Transportation Director to Borden, who assumed the duties without any additional compensation.[148]  Those cost savings were important to the Board because of its strained financial situation.[149]

## D.   The East Franklin Junior High School Principal Vacancy

The Board posted an opening for the position of East Franklin Junior High School principal on June 7, 2010.[150]  The position required a master's degree, a certification in school administration, and three years of teaching experience; supervisory experience was recommended.[151]  Like the Transportation Director position, the Codes published by the Alabama State Department of Education required a principal to have at least one of several types of educational certificates.[152]

Moss, Witt, and Scott Wiginton (who then was an agri-science teacher at Phil Campbell High School) applied for the position.[153]  Each candidate possessed the necessary certifications and degrees, but both Moss and Witt had more years of

---

[147] Doc. no. 17-6 (Deposition of Donald Borden), at 10-12.

[148] Defendant's Facts ¶¶ 30-32, 35.

[149] *Id.* ¶ 33.

[150] Plaintiffs' Facts ¶ 15.

[151] *Id.* ¶ 17; doc. no. 23-19 (Job Postings and Descriptions), at ECF 5 (Job Description for Junior High School Principal).

[152] Plaintiffs' Facts ¶ 16.

[153] *Id.* ¶ 15; doc. no. 23-10 (Deposition of Scott Wiginton), at 11-12.

education than Wiginton, and Witt also had more teaching experience.[154]  The Board

ultimately hired Wiginton during the summer of 2010.[155]

The Board allegedly considered Wiginton to be the superior applicant because,

during his teaching tenure, he had cultivated positive relationships with the public,

parents, students, co-workers, and administrators.[156]  The Board viewed Wiginton as

someone who possessed the interpersonal skills necessary to establish good rapport

with students and parents and, thus, to facilitate broad support for the school in the

community.[157]  The Board thought that such support was especially important given

the school system's financial difficulties.[158]

One incident, however, detracted from Wiginton's otherwise solid record.[159]

In February of 2005, five years before Wiginton was hired as principal, Marcus

Swinney and Tyler Messer — both of whom were Phil Campbell students at the time

— were loitering inside the school's greenhouse when Messer began playing with its

exhaust fan switch.[160]  Wiginton saw Messer and yelled at him to stop playing with

---

[154] Plaintiffs' Facts ¶ 16-18.

[155] Defendant's Facts ¶ 42.

[156] *Id*. ¶ 43.

[157] *Id.* ¶ 45.

[158] *Id.*

[159] When asked in her deposition if there was "anything else besides that particular circumstance" — that is, the incident currently under discussion — that detracts from "Wiginton's rapport with students," Witt responded "[n]ot that I can think of." Doc. no. 17-1 (Deposition of Resa Witt), at 108-09 (alteration supplied).

[160] Doc. no. 23-9 (Affidavit of Marcus Swinney) ¶ 2; doc. no. 23-10 (Deposition of Scott

the switch, apparently because the thermostat previously had been broken.[161]  When Messer did not comply, Wiginton tossed a chair at him; and, as both students scrambled for the door, he threw a garbage can at Swinney.[162]  The garbage can hit Swinney, knocked him down, and "left a red mark" on his back.[163]

After the incident, Swinney's father spoke with Wiginton,[164] although the content of that conversation is not clear.  Swinney, Swinney's mother, Wiginton, and Williams also held a conference (at the time, Bill Moss was superintendent, and Williams was his deputy).[165]  During their depositions, Williams did not remember the incident, and Wiginton was not aware of any investigation or reprimand.[166]

## E.    The Career-Technical Director/Evaluation Coordinator Position

The Board posted an opening for the position of "Career Technical Director/Evaluation Coordinator" on June 30, 2010.[167]  Orval Seay had held the title

---

Wiginton), at 32.

[161] Doc. no. 23-9 (Affidavit of Marcus Swinney) ¶ 2; doc. no. 23-10 (Deposition of Scott Wiginton), at 32.

[162] Doc. no. 23-9 (Affidavit of Marcus Swinney) ¶ 3.  Wiginton testified that he kicked the garbage can, but not at Swinney, and that it did not hit him.  Doc. no. 23-10 (Deposition of Scott Wiginton), at 32-33.

[163] Doc. no. 23-9 (Affidavit of Marcus Swinney) ¶ 3.

[164] Doc. no. 23-10 (Deposition of Scott Wiginton), at 34-35.

[165] *Id.* at 33-34.

[166] Doc. no. 17-5 (Deposition of Gary Williams), at 75-76, 146; doc. no. 23-10 (Deposition of Scott Wiginton), at 34, 36.

[167] Doc. no. 23-19 (Job Postings and Descriptions of Various Positions), at ECF 2 (Job Posting for Career Technical Director/Evaluation Coordinator).

of "Career Technical Director" since 1988, and assumed the duties of "Evaluation Coordinator" in 1997.[168]

## 1.    Qualifications for the position

### a.    The career-technical director portion of the position

The "career-technical director" portion of the position entailed, among other duties, publicizing information about the Board's career-technical education program, preparing a budget for that program, and supervising the operations of the Career-Technical Center.[169]  The Board required a master's degree, *a certification in career-technical administration*, and *five years* of teaching or supervisory experience *in career-technical education*.[170]  The Board had required all but the master's degree for at least ten years.[171]

The Alabama State Department of Education issues the career-technical administration certificate, which satisfies the *Department's* certification requirement for a career-technical director.[172]  Yet that certificate is just one of several types of certificates that the Department's Subject and Personnel Codes recognize as appropriate for the career-technical director position.  One such alternative certificate

---

[168] Doc. no. 23-15 (Affidavit of Orval Seay) ¶ 2.

[169] Doc. no. 23-19 (Job Postings and Descriptions of Various Positions), at ECF 3 (Job Description for Career Technical Director/Evaluation Coordinator).

[170] *Id.*; *see* Defendant's Facts ¶ 48.

[171] Defendant's Facts ¶ 48.

[172] *Id.* ¶¶ 49-50.

is the "educational administrator certificate."[173]

County boards of education may require *additional* qualifications that supplement those required by the State,[174] as the Board apparently did when it required a master's degree and five years of teaching or supervisory experience in career-technical education.[175]  Nevertheless, it is not clear whether a local school board can *exclude* a credential that the State Department's Codes establish as a qualification for a position.  Thus, the court will assume that a school board cannot do so.

Consequently, *either* the educational administrator certificate *or* the career-technical administrative certificate met the "certificate requirement" for the career-technical director portion of the position.  In fact, Superintendent Williams admitted to Witt that the Board's acceptance of *only* the career-technical administrative certificate for the position "needs to be changed," because "it really restricts our pool of applicants."[176]  Williams did not change the requirement unilaterally, however, because the job had already been posted, and he "didn't feel like in the middle of a

[173] Plaintiffs' Facts ¶ 9.

[174] *Id.* ¶ 11; *see also* doc. no. 23-20 (Emails between Resa Witt and Dr. Jayne A. Meyer); doc. no. 17-5 (Deposition of Gary Williams), at 66-67.

[175] *See* doc. no. 23-16 (Alabama State Department of Education *Subject and Personnel Codes*), at ECF 15 (not requiring a master's degree or experience for the career-technical director position).

[176] Doc. no. 17-5 (Deposition of Gary Williams), at 65-66.  Witt telephoned several (but not all) colleges in Alabama about the availability of the career-technical administrative certificate, but none of them offered it.  Doc. no. 17-1 (Deposition of Resa Witt), at 56-65.

posting we could go back and change a job description."[177]

### b.   The evaluation coordinator portion of the position

The Board's practice appended the "supplemental duties of coordinating the school system's employee evaluations" to the career-technical director position.[178] The evaluation coordinator's duties included ensuring that all teachers were evaluated every three years, compiling those evaluations, and providing them to principals and assistant principals in the school system.[179]  Orval Seay described his former position as encompassing "supervisi[on] and coordinat[ion of] the professional evaluation of all administrators and teachers in  grades . . . K-12 for the school system."[180]

The State Department of Education's Subject and Personnel Codes do not list "evaluation coordinator" as a position.[181]  Instead, the Codes describe a "coordinator" position — "an individual who oversees all aspects of an education program" — and an "evaluator" position — "an individual responsible for evaluating . . . employee performance."[182]  According to the Codes, "coordinator" and "evaluator" share the

---

[177] Doc. no. 17-5 (Deposition of Gary Williams), at 66.

[178] Defendant's Facts ¶ 52.

[179] Doc. no. 17-7 (Deposition of Herbert Truelove), at 22-24.

[180] Doc. no. 23-15 (Affidavit of Orval Seay) ¶ 3 (alterations supplied).

[181] *See* doc. no. 23-16 (Alabama State Department of Education *Subject and Personnel Codes*).

[182] *See id.* at ECF 17.

same certification requirements.[183]  The Board, then, appears to have combined those two roles, and the court will apply the requirements of the Codes to the "evaluation coordinator" portion of the position.  Several different types of certificates satisfy the requirements of the Codes, including an educational administrator certificate.[184]

### 2.    The applicants

Witt, Moss, and Herbert Truelove (who then was an agri-science education teacher at Red Bay High School) applied for the career-technical director/evaluation coordinator position.[185]  All three applicants had the requisite master's degree.  Witt and Moss had higher levels of education, but Truelove had undergraduate and master's degrees in the agri-science field.[186]  Further, Witt and Moss both possessed an educational administrator certificate, but lacked a career-technical administrative certificate.[187]  Truelove, conversely, had a career-technical administrative certificate, but lacked an educational administrator certificate.[188]

Thus, even though all three applicants met the *certification requirement* for the *career-technical director portion* of the position, Truelove did not meet the

---

[183] *Id.*

[184] *Id.*

[185] Plaintiffs' Facts ¶ 7; doc. no. 17-7 (Deposition of Herbert Truelove), at 15-16.

[186] Doc. no. 17-1 (Deposition of Resa Witt), at 13-16; doc. no. 17-3 (Deposition of Amy Moss), at 15; doc. no. 17-7 (Deposition of Herbert Truelove), at 7.

[187] *See* Plaintiffs' Facts ¶¶ 3, 6.

[188] Doc. no. 23-17 (Certificates), at ECF 3 (Ruie Herbert Truelove Certificate Details).

certification requirement for the *evaluation coordinator portion* of the position, at least as stated by the Codes.[189]  (Truelove instead received faculty evaluation training through two workshops offered by the Alabama Professional Educational Personnel Evaluation Program.[190])   Even so, although the State Department of Education imposes penalties on school systems that employ administrators who lack the proper certification, the Board did not receive such penalties for employing Truelove.[191]

At the time of his application, Truelove had superior teaching or supervisory experience in career-technical education, because he had taught agri-science education at Red Bay High School for twenty-three years.[192]   In contrast, Witt taught career exploration classes for "two or three years" in Franklin County, and a "computer-discovery" vocational class for three years in Tishomingo County, Mississippi.[193]   Finally, Moss lacked the requisite five years of teaching or supervisory experience in career-technical education.[194]

---

[189] *Compare* doc. no. 23-16 (Alabama State Department of Education *Subject and Personnel Codes*), at ECF 17 (listing certificates that meet requirements for coordinator or evaluator) *with* doc. no. 23-17 (Certificates), at ECF 3 (Ruie Herbert Truelove Certificate Details).

[190] Doc. no. 17-7 (Deposition of Herbert Truelove), at 20-21, 30.

[191] Defendant's Facts ¶ 55.

[192] *Id.* at 15.

[193] Doc. no. 17-1 (Deposition of Resa Witt), at 20-23, 78-79.

[194] Defendant's Facts ¶ 56 (admitted only as to Moss's teaching experience); *see also* doc. no. 17-3 (Deposition of Amy Moss), at 126-27 (admitting that, as of 2010, Moss had no teaching or supervisory experience in career-technical education).

The Board hired Truelove at its July 15, 2010 meeting without an interview.[195] Superintendent Williams testified that Truelove was hired over Witt and Moss because he "was the only applicant that applied for" the position who had the career-technical administrative certificate.[196]   Truelove receives a salary supplement for the duties associated with the evaluation coordinator portion of the position.[197]

## F.     Assistant Principal at Tharptown High School

On June 7, 2010, the Board posted an opening for a half-time assistant principal position at Tharptown High School.[198]  Although Witt applied for the position, the Board hired Cynthia Forsythe, another female, who was working full-time in the Board's central office.[199] Upon receiving the position, Forsythe began working a half-day at Tharptown and a half-day in the central office.[200]  The arrangement allowed the Board to save costs, because Forsythe assumed the duties of assistant principal without additional compensation, and the Board did not have to hire an additional employee.[201]

---

[195] Plaintiffs' Facts ¶ 7.

[196] Doc. no. 17-5 (Deposition of Gary Williams), at 65.

[197] Defendant's Facts ¶ 51.

[198] *Id.* ¶ 38; doc. no. 17-2 (Exhibits to Deposition of Resa Witt), Ex. 33 (Posting for Tharptown Assistant Principal Position), at ECF 8.

[199] Defendant's Facts ¶¶ 39-40.

[200] *Id.* ¶ 39.

[201] *Id.* ¶ 41.

**G.   Plaintiffs' Working Conditions Since Filing Their EEOC Charges**

Plaintiffs filed charges of gender discrimination against the Board with the Equal Employment Opportunity Commission ("EEOC") on July 26, 2010.[202]   The Board learned of Moss's charge on August 2, 2010, and of Witt's charge the following day.[203]

**1.   Moss's planning period**

In the summer of 2009, Gary Odum — then the assistant principal at Phil Campbell High School — approached Moss about the need for someone to teach a class at Phil Campbell Elementary School, which is located behind the high school on the same campus.[204]   Moss said that she would be willing to teach the class during the first period of each day, but only on the condition that he allowed her to schedule her planning period for the second period of the day, in order that she would not have to "rush back" to the high school.[205]   At that time, Moss discussed the arrangement only with Odum, who made each teacher's class schedule.[206]

During the 2009-10 school year, Moss's planning period was indeed scheduled for the second period of each day, but the following year, her planning period was not

---

[202] Plaintiffs' Facts ¶ 43.

[203] *Id.*

[204] Doc. no. 17-3 (Deposition of Amy Moss), at 179, 181; doc. no. 17-5 (Deposition of Gary Williams), at 23.

[205] Doc. no. 17-3 (Deposition of Amy Moss), at 180.

[206] *Id.* at 181.

set immediately after her class at the elementary school.[207]  Moss learned of that change when she received the 2010-11 schedule *on July 27, 2010*: *i.e.*, the day after she filed her EEOC charge, but about one week before the Board learned of the charge.[208]  Moss sent an email to Principal Davis on July 29, 2010, explaining her prior understanding with Odum, and requesting that her planning period be rescheduled.[209]  Davis responded that she was not aware of the prior arrangement between Moss and Odum, but that she was "working" on changing the schedule.[210]  Moss's planning period was ultimately not rescheduled, because doing so would have required rearranging the schedule for the entire school.[211]

Moss filed a grievance over the issue on August 12, 2010.[212]  Principal Davis denied the grievance on August 18th, and Assistant Superintendent Borden and Superintendent Williams upheld Davis's decision on September 3rd and October 4th, respectively.[213]  The grounds for those decisions were that:  no one else knew of

---

[207] *Id.* at 183-84; doc. no. 17-5 (Deposition of Gary Williams), at 125.

[208] *See* doc. no. 17-3 (Deposition of Amy Moss), at 184-86.

[209] *Id.* at 185-87; doc. no. 17-4 (Exhibits to Deposition of Amy Moss), Ex. 9 (Emails between Amy Moss and Cindy Davis), at ECF 22-23.

[210] Doc. no. 17-4 (Exhibits to Deposition of Amy Moss), Ex. 9 (Emails between Amy Moss and Cindy Davis), at ECF 22; *see also* doc. no. 17-5 (Deposition of Gary Williams), at 125-26.

[211] Doc. no. 17-5 (Deposition of Gary Williams), at 126.

[212] Doc. no. 23-2 (Affidavit of Amy Moss) ¶ 61; doc. no. 17-4 (Exhibits to Deposition of Amy Moss), Ex. 10 (Amy Moss Grievance and Accompanying Documents), at ECF 27-33.

[213] Doc. no. 17-4 (Exhibits to Deposition of Amy Moss), Ex. 10 (Amy Moss Grievance and Accompanying Documents), at ECF 30-33.

Moss's prior arrangement with Odum; rearranging the schedule at that time would have imposed an unfair hardship on the entire school; and Moss's schedule provided ample time (sixteen minutes) for her to travel from the elementary school to the high school, especially given that the schools shared a common campus.[214]  Davis and Williams each pledged to attempt to accommodate Moss's request to schedule her planning period for the second period of each day in future schedules, and Moss received that accommodation during the subsequent, 2011-12 school year.[215]

When Superintendent Williams issued the final denial of Moss's grievance on October 4, 2010, he told Moss that she could bring the issue before the Board at its next meeting on October 12 of the same year.[216]  The Board heard Moss's position in an executive session, during which Moss alleged that the request of a male colleague for a schedule change had been accommodated, but that hers had not.[217]  Williams told Moss to "quit bringing that male crap up — you ain't got nothing," and "your male crap ain't no good."[218]

## 2.    Moss's classroom materials

---

[214] *Id.*

[215] *Id.* at ECF 30, 32; doc. no. 17-5 (Deposition of Gary Williams), at 126; doc. no. 17-3 (Deposition of Amy Moss), at 199.

[216] Doc. no. 17-4 (Exhibits to Deposition of Amy Moss), Ex. 10 (Amy Moss Grievance and Accompanying Documents), at ECF 33; Plaintiffs' Facts ¶ 45.

[217] Plaintiffs' Facts ¶ 45; doc. no. 17-5 (Deposition of Gary Williams), at 127-28.

[218] Doc. no. 23-2 (Affidavit of Amy Moss) ¶ 62; *see also* doc. no. 17-5 (Deposition of Gary Williams), at 128.

Beginning sometime in 2011, Moss's mobile classroom lacked certain basic materials, such as classroom partitions, tables, desks, and a computer.[219]  Apparently, at least some of the materials allocated to Moss's classroom were destroyed by the tornados that swept through Alabama during April of 2011.[220]  After Moss began requesting replacement materials on August 11, 2011, she received desks on August 24, 2011, and a computer sometime after September 14 of the same year.[221]  However, she had not received classroom partitions as of April 1st of the following year, and the record is not clear on whether she has received tables as of the end of the briefing schedule.[222]

### 3.    Moss's meeting with Williams and Davis on October 20, 2010

Moss was called to a meeting with Superintendent Williams and Principal Davis in Davis's Phil Campbell High School office on October 20, 2010.[223]  Williams initially wanted to discuss Moss's EEOC charge, but Moss refused to do so without the presence of counsel.[224]  Williams then said that he had something else for Moss,

---

[219] Doc. no. 23-2 (Affidavit of Amy Moss) ¶ 71.

[220] Doc. no. 17-14 (Exhibits to Deposition of Amy Moss), Ex. 18 (Emails between Amy Moss and Various Administrators), at ECF 40-41 (regarding water damage to Moss's computer).

[221] Doc. no. 23-2 (Affidavit of Amy Moss) ¶¶ 71-72; doc. no. 17-3 (Deposition of Amy Moss), at 229 ("When Matt came to hook up my computer . . ."); doc. no. 17-14 (Exhibits to Deposition of Amy Moss), Ex. 18 (Emails between Amy Moss and Various Administrators), at ECF 40-41 (emails sent on September 14, 2011 regarding Moss's computer).

[222] Doc. no. 23-2 (Affidavit of Amy Moss) ¶ 72.

[223] *Id.* ¶ 64.

[224] *Id.*; doc. no. 17-3 (Deposition of Amy Moss), at 167.

and pulled out a letter dated October 7, 2010 from Davis to Williams,[225] which reported a conversation between Davis and Phil Campbell teacher "Bo" Culver during the spring of that year.[226]   According to the letter, Culver witnessed an incident between Moss and a student in the fall of 2009, during which Moss instructed a student to throw away a cardboard box but, when the student protested that he (or she) would be late for class, Moss replied, "throw this away, you asshole."[227]   When Williams indicated that he was prepared to issue a reprimand, Moss denied the incident and left the room to call Jonathon Jones, an EEOC investigator, who said that he would contact Danny McDowell, an attorney for the Board.[228]   Jones later assured Moss that she would not be reprimanded, and Moss admits that she "never received a reprimand" for the alleged incident.[229]

### 4.   "Extra assignments" for Moss

Moss only taught physical education classes at Phil Campbell High School from 2005 to 2010.[230]   However, Principal Davis assigned Moss to teach a health class in

---

[225] Doc. no. 17-3 (Deposition of Amy Moss), at 212-13, 169; doc. no. 17-4 (Exhibits to Deposition of Amy Moss), Ex. 15 (Cindy Davis's Letter of Oct. 7, 2010 to Gary Williams), at ECF 37.

[226] Doc. no. 17-4 (Exhibits to Deposition of Amy Moss), Ex. 15 (Cindy Davis's Letter of Oct. 7, 2010 to Gary Williams), at ECF 37.

[227] *Id*.

[228] Doc. no. 17-3 (Deposition of Amy Moss), at 169-73, 330-31, 328-30; doc. no. 23-2 (Affidavit of Amy Moss) ¶ 68.

[229] *Id.* at 171, 329, 332; *see also id.* at 169-71, 329-34.

[230] Doc. no. 23-2 (Affidavit of Amy Moss) ¶ 73.

41

2011, and a "basic skills" class in 2012.[231]   Due to those changes in her teaching

assignments, Moss had to undertake additional class preparation, lesson-planning, and

paper-grading.[232]   Even so, those changes have not resulted in her teaching a greater

number of classes or hours.[233]

### 5.      "Extra Assignments" for Witt

Witt makes the general claim that she "was assigned extra duties.  No other

teachers were on the list for extra duties."[234]  In an email dated February 24, 2012,

Witt described her discussions with Principal Davis on February 22nd and 23rd on the

subject of her afternoon bus duty.[235]  On February 22nd, Davis instructed Witt to move

her observation spot down several feet from her usual location.[236]  The following day,

Davis again approached Witt during bus duty, and told her that several of her students

were loitering by the school steps, a criticism that Witt thought unfair, because

teachers on bus duty are supposed to take their students with them.[237]   Witt also

objected to the fact that she was assigned bus duty "with no help," because the other

---

[231] *Id.*; *see also* doc. no. 17-3 (Deposition of Amy Moss), at 24-25.

[232] Doc. no. 23-2 (Affidavit of Amy Moss) ¶ 73.

[233] Doc. no. 17-3 (Deposition of Amy Moss), at 25-26.

[234] Doc. no. 23-12 (Declaration of Resa Witt) ¶ 30.

[235] *See* doc. no. 23-30 (Extra Assignments), at ECF 2-3 (Resa Witt Email of Feb. 24, 2012 to John Saxon and Molly Murphy).

[236] *Id.* at ECF 2.

[237] *Id.* at ECF 2-3.

teacher on duty, Darit Riddle, had been allowed to leave in order to coach a game.[238]

As evidence of other extra duties, Witt cites her teaching schedule for April 6th (the year of the schedule is not apparent), which set the ninth-grade students for a field trip to the Career Technical Center with "Coach Pounders, Coach [Kelly] Kiser, and Coach [Darit] Riddle."[239]  Because the field trip was held during the fifth, sixth, and seventh periods of the day, the schedule also assigned several teachers to cover Kiser's fifth through seventh period classes.[240]  Witt was assigned to cover twenty minutes of Kiser's sixty-five minute fifth period class (another teacher took the remainder), and to cover thirteen minutes of Kiser's seventh period class.[241]  Moss was assigned to cover twenty-seven minutes of Kiser's sixth period class.[242]

### 6.    Witt's classroom conditions

During the winter of 2010, Witt and others were frequently ill, and had sores in their noses — conditions that Witt believed might be caused by the source of an unpleasant odor that emanated from beneath the hallway near her classroom at Phil Campbell High School.[243]  In late November or early December of 2010, the janitor

---

[238] *Id.*

[239] *Id.* at ECF 4 (Schedule of April 6th) (alterations supplied); doc. no. 23-30 (Extra Assignments), at ECF 4 (Resa Witt Email of Feb. 24, 2012 to John Saxon and Molly Murphy).

[240] *Id.*

[241] *Id.*

[242] *Id.*

[243] Doc. no. 17-1 (Deposition of Resa Witt), at 307.

investigated the smell, and discovered that fumes were leaking from an old sewer system under the school.[244]   The leak was repaired soon thereafter.[245]

Further, Phil Campbell was heated by a central boiler unit, which prevented Witt from personally adjusting the temperature in her classroom.[246]   When Witt arrived at school on December 13, 2010, the temperature in her classroom was thirty-eight degrees.[247]   Principal Davis was not at school, so Witt emailed Superintendent Williams.[248]   Witt eventually spoke with Davis, who said that the heat would be turned on when the weather got a little colder.[249]   Meanwhile, the lack of heat continued for "several days."[250]   Once the heat was turned on, it took several hours to warm the classroom.   Further, the central boiler unit often caused the classroom to overheat.[251]

On December 13, 2010, the day she emailed Superintendent Williams about the

---

[244] Doc. no. 17-1 (Deposition of Resa Witt), at 310-12, 314-15; doc. no. 23-12 (Declaration of Resa Witt) ¶ 31; *see also* doc. no. 17-2 (Exhibits to Deposition of Resa Witt), Ex. 37 (Emails of Dec. 13, 2010 between Resa Witt and Donald Borden), at ECF 72 (referencing the elimination of the sewer odor).

[245] Doc. no. 17-1 (Deposition of Resa Witt), at 314; doc. no. 17-2 (Exhibits to Deposition of Resa Witt), Ex. 37 (Emails of Dec. 13, 2010 from Resa Witt and Donald Borden), at ECF 72.

[246] Doc. no. 17-1 (Deposition of Resa Witt), at 306.

[247] *Id.* at 306-07; doc. no. 17-2 (Exhibits to Deposition of Resa Witt), Ex. 36 (Email of Dec. 13, 2010 from Resa Witt to Gary Williams), at ECF 65.

[248] Doc. no. 17-2 (Exhibits to Deposition of Resa Witt), Ex. 36 (Email of Dec. 13, 2010 from Resa Witt to Gary Williams), at ECF 71.

[249] Doc. no. 17-1 (Deposition of Resa Witt), at 307; doc. no. 23-12 (Declaration of Resa Witt) ¶ 32.

[250] Doc. no. 17-1 (Deposition of Resa Witt), at 308-09.

[251] *Id.* at 307-09; doc. no. 23-12 (Declaration of Resa Witt) ¶ 32.

temperature, Witt also emailed Assistant Superintendent Borden about what she believed to be "black mold" in the basement rooms beneath her classroom.[252]  Borden responded that the county Health Inspector, as well as several others — presumably addressing the odor issue — had surveyed the area two weeks previously, and had not seen any mold.[253]  Still, Borden instructed the school janitor to spray the area as a precaution.[254]  According to Witt, that treatment eliminated some, but not all, of the mold.[255]

### 7.   Witt's need to attend a make-up faculty meeting

Phil Campbell High School holds weekly faculty meetings each Tuesday afternoon.[256]  Because coaches have practice during that time, and cannot attend the meetings, a "make-up" faculty meeting is held on Friday mornings.[257]  On Tuesday, October 12, 2010, Witt informed Principal Davis that she would not be able to attend that afternoon's faculty meeting because of an appointment, but that she would attend the make-up meeting on Friday.[258]  Davis responded by chiding Witt: "I have asked

---

[252] Doc. no. 17-2 (Exhibits to Deposition of Resa Witt), Ex. 37 (Emails of Dec. 13, 2010 between Resa Witt and Donald Borden), at ECF 72.

[253] *Id.*

[254] *Id.*; doc. no. 23-12 (Declaration of Resa Witt) ¶ 34; doc. no. 17-1 (Deposition of Resa Witt), at 313.

[255] Doc. no. 17-1 (Deposition of Resa Witt), at 312-13; doc. no. 23-12 (Declaration of Resa Witt) ¶ 34.

[256] Doc. no. 17-1 (Deposition of Resa Witt), at 145.

[257] *Id.* at 145-46.

[258] *Id.* at 146-47; doc. no. 17-2 (Exhibits to Deposition of Resa Witt), Ex. 12 (Emails of Oct.

the entire faculty to refrain from making appointments on the days we have designated for staff meetings.  Your absences will be considered unexcused and you will be considered insubordinate if this behavior continues."[259]

Witt explained that she needed to transport her mother-in-law home, following her release from the hospital, and that Witt could not control when the hospital released her.[260]  After Principal Davis learned of the basis for Witt's request to attend the make-up faculty meeting, she agreed that "the make-up meeting is designed" for such circumstances, and that Witt had a valid excuse.[261]  But Davis also told Witt, without further elaboration, that "the pattern of your behavior throughout the school year could be cause for concern."[262]  Nevertheless, Witt acknowledged that she was allowed to attend the Friday morning make-up meeting, and that she was not reprimanded for missing the normal Tuesday afternoon meeting.[263]

### 8.   Witt's student load

At the start of the 2010-11 school year, Witt realized that she had a total of

---

12, 2010 between Resa Witt and Cindy Davis), at ECF 23-24.

[259] Doc. no. 17-1 (Deposition of Resa Witt), at 146-49; doc. no. 17-2 (Exhibits to Deposition of Resa Witt), Ex. 12 (Emails of Oct. 12, 2010 between Resa Witt and Cindy Davis), at ECF 23.

[260] *Id.*

[261] *Id.*

[262] Doc. no. 17-1 (Deposition of Resa Witt), at 153; doc. no. 17-2 (Exhibits to Deposition of Resa Witt), Ex. 12 (Emails of Oct. 12, 2010 between Resa Witt and Cindy Davis), at ECF 23.

[263] Doc. no. 17-1 (Deposition of Resa Witt), at 155-58, 166-167.

approximately 150 students in her classes.[264]  Witt felt that her student load was not equitable, because the two other mathematics teachers at Phil Campbell High School had thirty to fifty *fewer* students.[265]  Significantly, however, Witt had had similar student loads in the past, including during the previous school year.[266]  Witt suggested eliminating the disparity by switching students or teachers for certain classes.[267]

Witt emailed Superintendent Williams on August 8, 2010 in order to make him "aware of the situation," and Williams agreed that the number of students in some of Witt's classes was "not the best situation."[268]  Williams then said that he would speak with Principal Davis, and hoped that Davis and the school guidance counselor could find a solution.[269]  Ultimately, the school guidance counselor informed Witt that her recommended schedule changes could not be implemented.[270]

### 9.    Discipline for Witt's students

In November of 2010, Witt began having disciplinary issues with a male

---

[264] *Id.* at 170-71, 176-77; doc. no. 17-2 (Exhibits to Deposition of Resa Witt, Ex. 15 (Emails of Aug. 8-9, 2010 between Resa Witt and Gary Williams), at ECF 27.

[265] Doc. no. 17-1 (Deposition of Resa Witt), at 170-71; doc. no. 17-2 (Exhibits to Deposition of Resa Witt), Ex. 15 (Emails of Aug. 8-9, 2010 between Resa Witt and Gary Williams), at ECF 27.

[266] Doc. no. 17-1 (Deposition of Resa Witt), at 171, 175, 183-84; doc. no. 17-2 (Exhibits to Deposition of Resa Witt), Ex. 15 (Emails of Aug. 8-9, 2010 between Resa Witt and Gary Williams), at ECF 27.

[267] Doc. no. 17-1 (Deposition of Resa Witt), at 171-73, 178, 180.

[268] Doc. no. 17-2 (Exhibits to Deposition of Resa Witt), Ex. 15 (Emails of Aug. 8-9, 2010 between Resa Witt and Gary Williams), at ECF 27.

[269] *Id.*

[270] Doc. no. 17-1 (Deposition of Resa Witt), at 173.

student identified as "E.B."[271]  On November 5, 2010, Witt sent E.B. to the office for

"disobedience," and the administration arranged a conference attended by Witt,

Principal Davis, the student's mother, and several others.[272]  On November 8th of the

same year, Witt again reported E.B. to the administration, this time for bullying.[273]

E.B. received corporal punishment ("3 licks") for his behavior, the same punishment

he received on November 18th for disrupting the classroom of another teacher.[274]

When the other teacher again reported E.B. to the administration in February of 2011

— this time for theft of school property — E.B. was suspended.[275]

Unfortunately, E.B.'s conduct did not improve, and on March 17, 2011, he drew

his fist back at Witt in a threatening manner.[276]  As a result of the incident, Witt was

told that E.B. would be suspended for two days, and he was indeed absent from class

the following day, although it is not clear whether his absence was due to suspension

or some other reason.[277]  Witt filed a police report for harassment against E.B. on

---

[271] *Id.* at 186-87, 200.

[272] *Id.* at 193-94; doc. no. 17-2 (Exhibits to Deposition of Resa Witt), Ex. 17 (Student Discipline Report of E.B.), at ECF 35.

[273] Doc. no. 17-2 (Exhibits to Deposition of Resa Witt), Ex. 16 (Discipline Reports), at ECF 28; doc. no. 17-1 (Deposition of Resa Witt), at 187-88.

[274] Doc. no. 17-2 (Exhibits to Deposition of Resa Witt), Ex. 17 (Student Discipline Report of E.B.), at ECF 35; doc. no. 17-1 (Deposition of Resa Witt), at 195-96.

[275] Doc. no. 17-2 (Exhibits to Deposition of Resa Witt), Ex. 17 (Student Discipline Report of E.B.), at ECF 35; doc. no. 17-1 (Deposition of Resa Witt), at 196-97.

[276] Doc. no. 17-2 (Exhibits to Deposition of Resa Witt), Ex. 25 (Sheriff's Department Incident Report), at ECF 47-49; doc. no. 17-1 (Deposition of Resa Witt), at 236-37.

[277] Doc. no. 17-2 (Exhibits to Deposition of Resa Witt), Ex. 25 (Sheriff's Department

March 18th, noting that she had been having trouble with E.B. "for the last five months": that is, since November of 2010.[278]  Witt ultimately did not file charges against E.B.[279]

Witt's disciplinary problems with other students continued into 2011.  When several male students disturbed her class on February 17, 2011, Witt asked for them to be suspended.[280]  However, after discussing Witt's request on February 18th, Assistant Principal Darit Riddle and Principal Davis instead decided to hold a conference attended by themselves, Witt, and the students' parents.[281]  Riddle also told Witt that, "[i]n the meantime, [Principal] Davis or I will be observing your 3rd period class in an effort to monitor the behavior of these students and to stop these students from hindering other students and make it easier on you to teach the class."[282]

Witt emailed Superintendent Williams twice within hours of learning of that decision.[283]  Witt's first message stated that she had reported students for disciplinary reasons on "numerous [occasions,] and they either get a paddling or break detention.

Incident Report), at ECF 47-49; Deposition of Resa Witt, at 236-38.

[278] Doc. no. 17-2 (Exhibits to Deposition of Resa Witt), Ex. 25 (Sheriff's Department Incident Report), at ECF 47-49; doc. no. 17-1 (Deposition of Resa Witt), at 236-37.

[279] Doc. no. 17-1 (Deposition of Resa Witt), at 239.

[280] Doc. no. 17-2 (Exhibits to Deposition of Resa Witt), Ex. 20 & 21 (Emails of Feb. 18, 2011 between Resa Witt and Gary Williams), at ECF 39-41.

[281] *Id.*, Ex. 22 (Email of Feb. 18, 2011 from Darit Riddle to Resa Witt), at ECF 42.

[282] *Id.* (alteration supplied); *see also* doc. no. 17-1 (Deposition of Resa Witt), at 216-17.

[283] Doc. no. 17-2 (Exhibits to Deposition of Resa Witt), Ex. 20, 21 & 23 (Emails of Feb. 18, 2011 between Resa Witt and Gary Williams), at ECF 39-41, 43.

[Holding a conference] does not work for senior boys who are defiant and hateful[.]"[284]  Witt also complained that when other teachers reported their students for having behavioral problems, the administration disciplined the students differently.[285]

Further, Witt disagreed with having an administrator observe her classroom, despite her admission that the presence of an administrator prevented students from misbehaving.[286]  Witt noted that other teachers who had disciplinary problems with students were not observed, and expressed her belief that observation "was an intimidation tactic," because it conveyed to the students that *Witt* had done something wrong.[287]  In closing, Witt told Williams:  "I hope this is not retaliation against me, but it definitely appears to be."[288]

In her second email message, Witt forwarded to Superintendent Williams the email chain that discussed the disciplinary decision by Assistant Principal Riddle and Principal Davis.  Williams immediately responded that he regretted the behavioral issues in Witt's classroom, and would speak with Riddle and Davis "to find a

---

[284] Doc. no. 17-2 (Exhibits to Deposition of Resa Witt), Ex. 20 & 21 (Emails of Feb. 18, 2011 between Resa Witt and Gary Williams), at ECF 39-41 (alterations supplied).

[285] *Id.*

[286] *Id.*; doc. no. 17-1 (Deposition of Resa Witt), at 221-22.

[287] Doc. no. 17-1 (Deposition of Resa Witt), at 221-23.

[288] Doc. no. 17-2 (Exhibits to Deposition of Resa Witt), Ex. 20 & 21 (Emails of Feb. 18, 2011 between Resa Witt and Gary Williams), at ECF 39-41.

remedy."[289]   In sum, Witt felt that the administration's response to her disciplinary complaints about E.B. and other students was less than its response to disciplinary complaints by other teachers, and that the subsequent observation of her classroom for three days was retaliation for her EEOC charge.[290]

## IV. DISCUSSION

Both plaintiffs allege that the Board did not promote them on the basis of their gender, and that it later retaliated against them for their acts of filing EEOC complaints of discrimination.   Moss also asserts a claim for wrongful termination/disparate treatment based on her termination from her position as coach of the Phil Campbell High School varsity girls' basketball team.   The parties agree that plaintiffs have no direct evidence of intentional discrimination.[291]

As a consequence, this court will apply the framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny.   Under that framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination based on circumstantial evidence.

---

[289] *Id.*, Ex. 23 (Emails of Feb. 18, 2011 between Resa Witt and Gary Williams), at ECF 43.

[290] *See* doc. no. 23-12 (Declaration of Resa Witt) ¶ 37; doc. no. 17-1 (Deposition of Resa Witt), at 191, 195-97, 208-10, 211-13, 215-224.

[291] *See* doc. no. 16 (Brief in Support of Summary Judgment), at 14-29 (proceeding under the *McDonnell Douglas* framework for circumstantial evidence); doc. no. 23 (Response Brief in Opposition to Summary Judgment), at 20-31 (same); doc. no. 27 (Reply Brief in Support of Summary Judgment), at 10-23 (same).

*Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-28 (11th Cir. 1997).

## A.      Wrongful Termination/Disparate Treatment

To establish a *prima facie* case of wrongful termination on the basis of a plaintiff's sex (*i.e.*, a disparate treatment claim), the plaintiff "must generally show that (1) plaintiff is a member of a protected class; (2) plaintiff suffered an adverse employment action; (3) the employer treated similarly situated employees outside of the protected class more favorably; and (4) plaintiff was qualified to do the job." *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228 (11th Cir. 2002) (citing *McDonnell Douglas*, 411 U.S. at 802; *Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001)).   The establishment of a *prima facie* case "creates a presumption that the employer unlawfully discriminated against the employee." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

To rebut that presumption, "the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the [contested employment decision]." *Burdine*, 450 U.S. at 255 (alteration supplied).  Further, the "explanation provided must be legally sufficient to justify a judgment for the defendant," even though the "defendant need not persuade the court that it was actually motivated by the proffered reasons."  *Id.* at 254-55.  "If the defendant carries this burden of production, the presumption raised by the *prima facie* case is rebutted," and "drops

from the case." *Burdine*, 540 U.S. at 255 n.10.

> [T]he plaintiff must then "come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." [*Chapman v. AI Transportation*, 229 F.3d 1012, 1024 (11th Cir. 2000) (*en banc*)] (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997)); *see also Reeves*, 530 U.S. at 143, 120 S. Ct. at 2106; *Perryman*, 698 F.2d at 1142. To show that the employer's reasons were pretextual, the plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs*, 106 F.3d at 1538.

*Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004) (alterations supplied). The plaintiff must show that *each* of the proffered reasons are false, *and* that discrimination was the real reason for the defendant's decision. *See Brooks v. County Commissioner of Jefferson County*, 446 F.3d 1160, 1163 (11th Cir. 2006); *Jackson v. State of Alabama Tenure Commission*, 405 F.3d 1276, 1289 (11th Cir. 2005).

"A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer." *Chapman*, 229 F.3d at 1030; *see also Combs*, 106 F.3d at 1543. "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman*, 229 F.3d at 1030. Rebuttal requires that a plaintiff

present "significant probative evidence on the issue to avoid summary judgment. Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext." *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996) (internal citations and quotations omitted); *see also Chavez v. URS Federal Technical Services, Inc.*, No. 12-11037, 2013 WL 49722, *1 (11th Cir. Jan. 3, 2013).

Moss easily satisfies three of the four elements of her *prima facie* case: she is a member of the protected class of female coaches; she was qualified for her coaching position; and she suffered an adverse employment action when she was terminated from the position. *See Scott*, 295 F.3d at 1228. The sole issue is whether the Board "treated similarly situated employees outside of the protected class [*i.e.*, male coaches] more favorably." *Id.* (alteration supplied). The comparators "must be similarly situated *in all relevant respects*." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004) (emphasis supplied); *see also Holifield* v. *Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). When, as here, a plaintiff alleges that her termination was a form of discriminatory discipline, the Eleventh Circuit "require[s] that the *quantity and quality* of the comparator's misconduct be *nearly identical* to prevent courts from second-guessing employers' reasonable decisions." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir.1999)) (emphasis and alteration supplied); *see also Burke-Fowler v. Orange County, Florida*, 447 F.3d 1319, 1323 (11th Cir. 2006)).

54

Moss admits that the "similarly situated" standard is a "high bar."[292]

Even when construing the evidence in a light favorable to Moss, and making all reasonable inferences in her favor, several incidents do not speak well of her overall behavior or coaching demeanor. Moss generally refused to discuss with parents the playing time allowed their children, and informed one parent that she "did not have to explain anything" to him, and that "if he didn't like" her decisions on playing time, his daughter could quit the team.[293] She told a former player to "get the hell out of [her] face" at a basketball game between two schools within the Board's jurisdiction.[294] She threatened to permanently bench two senior players if they did not take action to quiet students who were chanting for those players to be allowed to play at Senior Night, their last home game.[295] During the same game, she turned and yelled at the student section to "shut up."[296] Superintendent Williams also received complaints from parents and members of the community about those incidents, as well as about Moss's general behavior and treatment of players.[297] The complaints often

---

[292] Doc. no. 23 (Response Brief in Opposition to Summary Judgment), at 27.

[293] Defendant's Facts ¶ 10; doc. no. 17-3 (Deposition of Amy Moss), at 82; doc. no. 17-9 (Affidavit of Gary Williams), Ex. B (Statements Regarding Amy Moss), at ECF 22 (Statement of S.J.'s Parents).

[294] Defendant's Facts ¶ 18 (alteration supplied); *see also* Statements Regarding Amy Moss, at ECF 25 (Statement of K.M.'s Grandmother).

[295] Defendant's Facts ¶ 23.

[296] Doc. no. 23-2 (Affidavit of Amy Moss) ¶ 13; doc. no. 17-1 (Deposition of Amy Moss), at 35.

[297] *See, e.g.*, doc. no. 17-5 (Deposition of Gary Williams), at 93 (describing Moss as going

portrayed the incidents as more severe than they are described above.  Although the court does not accept those versions of the incidents as true, the content of the complaints is relevant to a determination of whether male coaches about whom Williams also received complaints were "similarly situated."

The only comparator who arguably satisfies the "similarly situated" standard is Darit Riddle.  Moss also cites "Bo" Culver and Greg Watson as potential comparators,[298] but those coaches, unlike Moss, were each involved in only a single incident.  Culver once called a player "brain dead and dumb as a bag of hammers" after a poorly executed play.[299]  Watson threatened to "whip" an opposing player's "ass."[300]  One isolated incident does not rise to a level of misconduct that is "nearly

"ballistic" and swearing at a parent who inquired about his daughter's playing time); 96-97 ("I got calls from Jeff and Harold about [Moss having] the girls line up in a circle and put [J.H.] in the middle of it, saying that she caused them to lose the game. . . they were irate . . . she wouldn't talk to him . . . she told me she didn't talk to parents and that she wasn't going to talk to him."), 98 ("[T.M.'s] mother had called me at home.  She was upset about Coach Moss mistreating her daughter[.]"), 103-04 ("The things I heard from [the community], I mean, it was like constant about the way Coach Moss was treating our kids.  [Moreover, there was] probably eight to ten people that called me over [at a convenience store to tell me that Moss told the crowd to] shut the hell up. . . . [E]verybody in there was mad [about it.]"), 108 ("I received two or three more calls from people who were at the game" where Moss told the crowd to "shut the hell up."); *see also* doc. no. 23-2 (Affidavit of Amy Moss) ¶ 6 (admitting that Williams mentioned the "numerous complaints" he had received about Moss when he asked for her resignation) (all alterations supplied).

[298] Doc. no. 23 (Response Brief in Opposition to Summary Judgment), at 27-28.  Moss also cites Bill Smith as a potential comparator, but the evidence that underpins the allegations against him has been stricken.  *See* note 8, *supra* and accompanying text; doc. no. 28 (Response to Motion to Strike), at 8 (admitting that the affidavit of Riley Hughes should be stricken).

[299] Doc. no. 17-3 (Deposition of Amy Moss), at 173-74, 354-55; *see* doc. no. 17-5 (Deposition of Gary Williams), at 123-24.

[300] *See* doc. no. 23-4 (Affidavit of Bart Moss), Ex. A (Facebook Messages), at ECF 11-13 (Messages from Wes Borden, Wade Berryman, and Riley Hughes); doc. no. 17-3 (Deposition of

identical" to that attributed to Moss in quantity and quality.  *Burke-Fowler*, 447 F.3d at 1323.

As for Riddle, he danced with students and another teacher at the 2010 prom in a manner described as "humping," and he allegedly made inappropriate comments about a female player's breasts at a 2011 practice session ("it's nothing we haven't seen before," and "give her some Band-Aids to put over those mosquito bites"). Conspicuously absent from Riddle's career is the history of complaints that was lodged by parents and other community members against Moss.  Taking those differences into account, Moss has not established that she was "similarly situated" to "Bo" Culver, Greg Watson, or Darit Riddle, and her *prima facie* case fails.[301]

## B.    Failure to Promote Claims

To establish a *prima facie* case of discriminatory failure to promote, a plaintiff

---

Amy Moss), at 158-59.

[301] Moss also cannot show pretext.  The Board claims that it terminated Moss as a result of her pattern of behavior towards student-athletes and parents.  Moss devotes three sentences of "argument" to rebutting that reason as pretextual.  Doc. no. 23, at 28-29.  She cites evidence — most of which either is irrelevant, has been stricken, or addresses only the incident at Senior Night — purporting to establish that some of the complained-of behavior did not, in fact, occur.  But even when construing the events in Moss's favor, those events reinforce the Board's reasoning, rather than revealing that reasoning as pretextual.

Moreover, when analyzing pretext in this context, the question is *not* what misconduct *actually* happened, but what the defendant-employer *honestly believed* happened.  *Rioux v. City of Atlanta, Georgia*, 520 F.3d 1269, 1278 (11th Cir. 2008).  The facts as construed on summary judgment — not to mention the facts as the Board and Williams perceived them — easily satisfy the *Rioux* standard.  For all of those reasons, Moss's three-sentence argument fails to provide "significant probative evidence of pretext."  *Mayfield*, 101 F.3d at 1376.

must prove (1) that she is a member of a protected class, (2) that she was qualified for and applied for a promotion, (3) that she was rejected, and (4) that other equally or less qualified employees who were not members of the protected class were promoted instead. *Denney v. City of Albany*, 247 F.3d 1172, 1183 (11th Cir. 2001) (citing *Combs*, 106 F.3d at 1539 n.11). As with other Title VII claims, once the plaintiff proves a *prima facie* case of discriminatory failure to promote, the defendant-employer must offer a legitimate, nondiscriminatory reason for its decision. *Id.* If the defendant does so, the plaintiff must prove that its reason is pretextual. *Id.* However, the plaintiff cannot show pretext "by simply arguing or even by showing that [she] was better qualified than the [individual] who received the position [she] coveted." *Brooks v. County Commissioner of Jefferson County*, 446 F.3d 1160, 1163 (11th Cir. 2006) (alterations supplied); *Alexander v. Fulton County*, 207 F.3d 1303, 1339 (11th Cir. 2000). Instead, the plaintiff must "show that the disparities between the successful applicant's and her own qualifications were '*of such weight and significance* that *no reasonable person*, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff.'" *Brooks*, 446 F.3d at 1163 (emphasis supplied) (quoting *Cooper v. Southern Co.*, 390 F.3d 695, 732 (11th Cir. 2004), and citing *Ash v. Tyson Foods*, 546 U.S. 454, 457 (2006)).[302]

---

[302] In *Ash v. Tyson Foods*, 546 U.S. 454 (2006), the Supreme Court disapproved of the standard previously employed by the Eleventh Circuit: *i.e.*, that "[p]retext can be established

1.      **Transportation director**

The court will assume for the sake of the following discussion that both plaintiffs established a *prima facie* case for the Transportation Director position. Even so, their claims fail because they cannot establish that defendant's proffered legitimate, non-discriminatory reason for hiring a male for the position is actually a pretext for discrimination.

The parties stipulated that Donald Borden accepted the Transportation Director position without any additional compensation, resulting in "substantial cost savings" to the Board, which was an important consideration because of the Board's "poor financial condition,"[303] and which constituted a legitimate, nondiscriminatory reason for hiring him. Plaintiffs' sole argument regarding pretext is that "[i]t would have been just as cost-effective . . . to hire one of the Plaintiffs, who are both tenured teachers, for the [Transportation Director] position and replace one of their tenured positions with a non-tenured position."[304]

---

through comparing qualifications only when 'the disparity in qualifications is so apparent as virtually to jump off the page and slap you in the face.'" *Id.* at 456-57 (alteration supplied) (internal citations omitted). Even so, the Supreme Court approved of the standard that this Circuit employed elsewhere: *i.e.*, "that 'disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'" *Id.* at 457 (citing *Cooper*, 390 F.3d at 732).

[303] Defendants' Facts ¶¶ 30-33 (admitted by plaintiffs at doc. no. 23 (Response Brief in Opposition to Summary Judgment), at 3); *see also* doc. no. 27 (Reply Brief in Support of Summary Judgment), at 13 (noting the factual stipulation).

[304] Doc. no. 23 (Response Brief in Opposition to Summary Judgment), at 26 (alterations supplied).

As previously noted, however, a "plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer." *Chapman*, 229 F.3d at 1030.  That is precisely what plaintiffs' argument attempts to do.  Plaintiffs cannot demonstrate pretext simply by citing their own opinions about how best to manage the Board's limited financial resources.  "Federal courts do not sit as a super-personnel department that reexamines an entity's business decisions," *Elrod v. Sears, Roebuck and Co.*, 939 F.3d 1466, 1470 (11th Cir. 1991), and plaintiffs "cannot succeed by simply quarreling with the wisdom" of such decisions.  *Chapman*, 229 F.3d at 1030.

### 2.    Principal at East Franklin Junior High School

Plaintiffs' claims regarding the position of East Franklin Junior High School principal suffer from the same deficiency as their claims regarding the position of Transportation Director:  that is, even if plaintiffs could prove a *prima facie* case, they cannot show that the Board's proffered legitimate, nondiscriminatory reasons for hiring a male are pretexts for discrimination.

The parties agree that the Board hired Scott Wiginton because he "exhibited excellent skills in relating to the public, parents, students, co-workers, and administrators," and "was seen as an individual who possessed the personal and professional skills [needed] to establish a positive rapport with students and parents

60

that would engender broad community support for the school" — considerations that were important to the Board "during a time of financial stress."[305]   Although such considerations are subjective, they can nevertheless be legitimate, nondiscriminatory reasons.  *See, e.g., Denney*, 247 F.3d at 1186; *Chapman*, 229 F.3d at 1034.

To show that the Board's proffered reasons were pretextual, plaintiffs contend that, like Wiginton, they also have the support of students, administrators, co-workers and community members.[306]   However, even ignoring the allegations against Moss, and assuming that plaintiffs enjoy the *same* support as Wiginton, the argument that plaintiffs were *equally* (or even *better*) qualified than Wiginton falls short of a showing that the disparities between plaintiffs and Wiginton "were of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen" Wiginton over plaintiffs.  *Brooks*, 446 F.3d at 1163 (internal citations omitted).

In an apparent effort to show that Wiginton does not have the interpersonal qualities stipulated to by the parties, plaintiffs also emphasize a single incident *from 2005*, during which Wiginton tossed objects at misbehaving students, hitting one

---

[305] Defendants' Facts ¶¶ 43, 45 (alteration supplied) (admitted by plaintiffs at doc. no. 23 (Response Brief in Opposition to Summary Judgment), at 3); *see also* doc. no. 27 (Reply Brief in Support of Summary Judgment), at 14 (noting the factual stipulation).

[306] *Id.*

student with a garbage can, and knocking him off his feet.[307]  However, rebuttal of a proffered non-discriminatory reason for a challenged employment action requires "*significant* probative evidence" of pretext.  *Mayfield*, 101 F.3d at 1376 (emphasis supplied).  Further, plaintiffs must show that the proffered reason suffers from "weakness<u>es</u>, implausibili<u>ties</u>, inconsisten<u>cies</u>, incoheren<u>cies</u>, or contradictions . . . ." *Cooper*, 390 F.3d at 725 (underlined emphasis supplied).

Plaintiffs cannot meet the requirement of presenting *significant* evidence of pretext, and *more than one* reason for skepticism, by resurrecting a *single*, half-decade-old incident that was the subject of a conference, but for which the hired employee was neither investigated nor reprimanded.  Otherwise, once an employer proffered a legitimate, non-discriminatory reason for hiring an employee based upon a personality trait (*e.g.*, professionalism, composure, maturity, or attitude), a plaintiff could "rebut" that reason by unearthing a lone counterexample in his employment history.  Accordingly, the single incident relied upon by plaintiffs is not sufficient to establish that the Board's stated reason for hiring Wiginton was pretextual.

### 3.    Career Technical Director/Evaluation Coordinator Position

Plaintiffs cannot demonstrate a *prima facie* case of discrimination with regard to the Career Technical Director/Evaluation Coordinator position because they were

---

[307] Doc. no. 23 (Response Brief in Opposition to Summary Judgment), at 25-26.

not qualified for the position.  *See Denney*, 247 F.3d at 1183.  Specifically, plaintiffs

lacked the necessary teaching or supervisory experience in the requisite field.

Both historically, and in the Board's 2010 posting for the position, the career

technical director/evaluation coordinator was required to have *five years* of teaching

or supervisory experience in *career-technical education*.[308]  At the time she applied

for the position, Moss had never taught or supervised in career-technical education.[309]

Thus, Moss's *prima facie* case fails.

Witt's experience presents a closer question.  She taught career exploration

classes for "two or three years" in Franklin County.[310]  Before that, she taught

"computer discovery" classes for three years in Tishomingo County, Mississippi.[311]

Although the sum of those teaching experiences meets or exceeds five years, plaintiff

has not shown that teaching "computer discovery" in an out-of-state school system

would be accepted as teaching in the field of "career-technical education" by an

Alabama school system.

---

[308] Doc. no. 23-19 (Job Postings and Descriptions of Various Positions), at ECF 3 (Job Description for Career Technical Director/Evaluation Coordinator); Defendants' Facts ¶ 48.

[309] Defendant's Facts ¶ 56 (admitted only as to Moss's teaching experience); *see also* doc. no. 17-1 (Deposition of Amy Moss), at 126-27 ("Q:  In the summer of 2010, had you ever taught any Career Technical Education classes?  A:  No.  Q:  Had you ever supervised any Career Technical Education classes?  A:  No.").

[310] Doc. no. 17-1 (Deposition of Resa Witt), at 22-23, 78-79; *see also* doc. no. 23-18 (Class Schedules), at ECF 7-12.  These documents suggest that Witt taught career exploration classes for four years in Franklin County, but the difference is not dispositive.

[311] Doc. no. 17-1 (Deposition of Resa Witt), at 20-21, 78-79.

When considering a motion for summary judgment, "the court must . . . make all *reasonable inferences* in favor of" the nonmoving party.  *Chapman*, 229 F.3d at 1023 (emphasis supplied) (internal citations omitted).  Nevertheless, "an inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation."  *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983).  The record is devoid of evidence from which the court may infer that the "computer discovery" classes taught by Witt in Mississippi would count as "career-technical education" classes within an Alabama school system.  As a result, the court will not assume or speculate that such would be the case.  Thus, Witt's *prima facie* case also fails.

### 4.    Assistant Principal Position at Tharptown High School

Witt apparently abandoned her claim for the assistant principal position at Tharptown High School,[312] and rightfully so:  she cannot prove a *prima facie* case of gender discrimination, because the Board hired another female employee, Cynthia Forsythe, to fill the position.[313]  *See Denney*, 247 F.3d at 1183.

### C.    Retaliation

"Retaliation is a separate violation of Title VII."  *Gupta v. Florida Board of*

---

[312] Doc. no. 17-1 (Deposition of Resa Witt), at 29-32 (declining to include the position as one she is pursing); doc. no. 16 (Brief in Support of Summary Judgment), at 9 n.1; *see generally* doc. no. 23 (Brief in Opposition to Summary Judgment) (failing to discuss the position).

[313] Defendants' Facts ¶ 40.

*Regents*, 212 F.3d 571, 586 (11th Cir. 2000).  Section 704(a) of Title VII of the Civil

Rights Act of 1964 protects employees who oppose or participate in activities to

correct an employer's discriminatory practices.  The relevant statutory language reads

as follows:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a) (alteration supplied).    Congress thus recognized two

predicates for retaliation claims:  one for *opposition* to discriminatory practices, and

another for *participation* in protected activity.

> Under *the opposition clause*, an employer may not retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter." . . . And, under *the participation clause*, an employer may not retaliate against an employee because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

*Equal Employment Opportunity Commission v. Total System Services, Inc*., 221 F.3d

1171, 1174 (11th Cir. 2000) (emphasis supplied) (citations omitted).  The filing of a

formal charge of discrimination with the EEOC is protected under the "participation

clause."  *See, e.g., Berman v. Orkin Exterminating Co*., 160 F.3d 697, 702 (11th Cir.

1998).

65

The *McDonnell Douglas* framework applies equally to claims of retaliation based on circumstantial evidence.  *See Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006).  To establish a *prima facie* case of retaliation, the plaintiff must prove three elements:  (1) that she engaged in statutorily protected opposition or participation; (2) that she suffered a materially adverse action at the hands of her employer; and (3) that there was a causal linkage between the protected conduct and the adverse action.  *See, e.g., Bass v. Board of County Commissioners*, 256 F.3d 1095, 1117 (11th Cir. 2001); *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 507 (11th Cir. 2000).

"[A] plaintiff must show that a *reasonable* employee would have found the challenged action *materially* adverse, which in [the retaliation] context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006) (emphasis and alterations supplied) (internal quotation marks omitted). "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.*  The *Burlington Northern* decision broadened the type of employer conduct that is actionable in a retaliation claim "from that which adversely affects the plaintiff's conditions of employment or employment status to that which

has a materially adverse effect on the plaintiff . . . . This more liberal view of what constitutes an adverse employment action accords an employee protection from a wider range of retaliatory conduct." *Crawford v. Carroll*, 529 F.3d 961, 973-74 (11th Cir. 2008).

To demonstrate a "casual linkage" at the summary judgment stage, a plaintiff must only prove that the protected activity and the adverse employment action "are not completely unrelated." *Meeks v. Computer Associates International*, 15 F.3d 1013, 1021 (11th Cir. 1994) (quoting *EEOC v. Reichhold Chemical, Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993)). "At a minimum, a plaintiff must generally establish that the employer was *actually aware* of the protected expression" *at the time* it took the adverse employment action. *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993) (emphasis supplied). Additionally, "the temporal relationship between the protected activity and the adverse employment action must be 'very close.' Even a three-month interval between the protected expression" and the adverse action is too long. *Brown v. Alabama Department of Transportation*, 597 F.3d 1160, 1181 (11th Cir. 2010) (quoting *Clark County School District v. Breeden*, 532 U.S. 268, 273 (2001)) (citations omitted).

Plaintiffs' brief devotes a scant three pages of analysis to their numerous

retaliation claims.[314]  Those claims fail, oftentimes for more than one reason, and typically because plaintiffs do not establish a *prima facie* case, even when the Board's actions are considered collectively.  *See Akins v. Fulton County, Geogia*, 420 F.3d 1293, 1301 (11th Cir. 2005) (considering an employer's actions both individually and collectively); *see also Jiles v. United Parcel Service, Inc.*, 360 F. App'x 61, 66 (11th Cir. 2010) (*per curiam*) (instructing courts to consider collectively only those alleged reprisals that are "truly adverse" and commenced "almost immediately" after protected activity).

### 1.    Moss's planning period

The failure to set Moss's planning period for the second period of each day during the 2010-11 school year, or to change her schedule once classes had begun, was not causally related to her protected activity.  "To prove a causal connection between an employee's protected activity and the adverse employment action . . . the employee must show that:  (a) the decision-makers *were aware of the protected conduct*; and (b) the protected activity and the adverse employment action were not wholly unrelated."  *Siler v. Hancock County Board of Education*, 510 F. Supp. 2d 1362, 1380-81 (M.D. Ga. 2007) (quoting *Gupta*, 212 F.3d at 590) (emphasis supplied), *aff'd* 272 F. App'x 881 (11th Cir. 2008).  Moss learned of her 2010-11

---

[314] Doc. no. 23 (Response Brief in Opposition to Summary Judgment), at 29-31.

schedule on July 27, 2010, but the Board did not receive notice of her EEOC complaint until August 2, 2010, *after* the schedule had been generated and distributed.[315]   Thus, there can be no causal connection between Moss's EEOC complaint and her schedule.  *See Johnson v. Atlanta Independent School System*, 137 F. App'x 311, 315 (11th Cir. 2005); *Pate v. Chilton County Board of Education*, 853 F. Supp. 2d 1117, 1137 (M.D. Ala. 2012).

Even if Moss could overcome that deficiency, the Board offered three legitimate, nondiscriminatory reasons for the content of Moss's 2010-11 schedule, and her inability to amend it:  none of the persons who were responsible for preparing and distributing the 2010-11 schedules knew of Moss's prior agreement with former assistant principal Gary Odum; rearranging the schedules once classes had begun would have imposed an unfair hardship on the entire school; and Moss's schedule provided ample time — sixteen minutes — for her to travel from the elementary school to the high school, which was located on the same campus.[316]   Because Moss offers no argument that any of those reasons were pretextual, her claim also fails on that ground.

### 2. Moss's classroom materials

---

[315] Plaintiffs' Facts ¶ 43; doc. no. 17-3 (Deposition of Amy Moss), at 184-86.

[316] Doc. no. 17-4 (Exhibits to Deposition of Amy Moss), Ex. 10 (Amy Moss Grievance and Accompanying Documents), at ECF 30-33.

Moss cannot establish a *prima facie* case with regard to her classroom materials, because there is no causal connection between the lack of various supplies in Moss's classroom and her EEOC complaint.

> The temporal relationship between the protected activity and the adverse employment action must be "very close." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2008) (quoting *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001)). *Even a three-month interval* between the protected expression and the employment action — the briefest interval we face here — *is too long*. *Id.* (citing *Richmond v. ONEOK*, 120 F.3d 205, 209 (10th Cir.1997)).

*Brown*, 597 F.3d at 1182 (emphasis supplied).   Moss's classroom did not lack materials until sometime in 2011, and she did not lodge a complaint about their absence until August 11, 2011.[317]  Thus, the alleged adverse action did not take place until five to twelve months *after* the Board received her EEOC complaint in early August of 2010, a temporal interval far exceeding that which can legally establish a causal connection.

### 3.    Moss's meeting with Williams and Davis on October 20, 2010

Under the pre-*Burlington Northern* standard, Moss's meeting with Superintendent Williams and Principal Davis — during which Williams threatened to reprimand Moss for allegedly calling a student an "asshole" — was not an adverse employment action, because Moss was not reprimanded, and did not suffer

---

[317] Doc. no. 23-2 (Affidavit of Amy Moss) ¶ 71.

disciplinary sanctions, loss of pay, or any other materially adverse impact on the conditions of her employment.[318]  *See Gupta*, 212 F.3d at 588 n.15 ("A threatened letter never actually written cannot constitute an adverse employment action.").  Post-*Burlington Northern*, the meeting presents a closer question, but nevertheless compels the same conclusion.

Because *Burlington Northern* was decided in 2006, published Eleventh Circuit cases that present factual guidance on what constitutes a "materially adverse action" under that standard are scarce.  Even so, "the fact that an employee continues to be undeterred in his or her pursuit of a remedy . . . may shed light as to whether the actions are sufficiently material and adverse to be actionable." *Burgos v. Napolitano*, 330 F. App'x 187, 190 (11th Cir. 2009).  Nevertheless, a plaintiff's "subjective response does not control the question." *Johnson v. Potter*, 732 F. Supp.2d 1264, 1282 (M.D. Fla. 2010).

Here, Moss told Williams at the conclusion of the meeting that she intended to contact the EEOC, and then immediately did so.[319]  *See Morales v. Georgia Department of Human Resources*, 446 F. App'x 179, 183-84 (11th Cir. 2011) (finding no adverse action where the plaintiff's evaluations and reprimands did not dissuade her from making another discrimination charge); *Tarmas v. Secretary of Navy*, 433 F.

---

[318] Doc. no. 17-3 (Deposition of Amy Moss), at 169-171, 329-34.
[319] *Id.* at 169-71, 328-30.

App'x 754, 763 (11th Cir. 2011) (holding that the plaintiff "has not shown that the email citing poor job performance was a materially adverse action" because plaintiff's receipt of the email did not dissuade him from pursuing his claim).

An employer's investigation of, and suggested discipline for, alleged misconduct typically does not amount to a materially adverse action. *See Rademakers v. Scott*, 350 F. App'x 408, 412-13 (11th Cir. 2009) (holding that an investigation into alleged misconduct, and a subsequent recommendation of termination, would not dissuade a reasonable worker from making or supporting a charge of discrimination). Thus, under the totality of the circumstances, a reasonable employee would not have found the October 20th meeting with Williams and Davis "materially adverse." *Burlington Northern*, 548 U.S. at 68-71.

### 4.    "Extra assignments" for Moss and Witt

Moss's assignments of teaching a health class in 2011 and a basic skills class in 2012 were not materially adverse actions because they would not dissuade a reasonable employee from making or supporting a charge of discrimination. Although Moss *did* have to undertake additional class preparation, lesson-planning, and paper-grading, she did *not* have to teach a greater number of hours or classes.[320]  As Judge Ira DeMent observed, "[f]acing challenges such as learning new course material and

---

[320] Doc. no. 23-2 (Affidavit of Amy Moss) ¶ 73; doc. no. 17-3 (Deposition of Amy Moss), at 25-26.

preparing for new classes is an inherent aspect of the teaching profession." *Bell v. Eufaula City Board of Education*, 995 F. Supp. 1377, 1385-86 (M.D. Ala. 1998) (alterations supplied). Thus, Moss's new classes were, at most, "minor annoyances." *Burlington Northern*, 548 U.S. at 68. Further, the classes were added to Moss's teaching load in 2011 and 2012, well after the Board received her EEOC complaint in August of 2010. *See Brown*, 597 F.3d at 1182 (three month interval too long to find causal connection); *Thomas*, 506 F.3d at 1364 (same).

Likewise, Witt's complaints about bus duty on February 22 and 23, 2012 involve events that took place over a year and a half after defendant received her EEOC complaint, and amount to nothing more than her questioning of her superiors' judgment regarding the number and location of teachers on duty. *See Wilson*, 376 F.3d at 1092. Moreover, the April 6th teaching schedule imposed less time covering Coach Kelly Kiser's classes on Witt and Moss (thirty-three minutes and twenty-seven minutes, respectively) than it did a non-plaintiff teacher (forty-five minutes).[321] Additionally, and regardless of whether the schedule was for April 6, 2010, or April 6, 2011, it failed to satisfy the "causally connected" element of the *prima facie* case: the schedule was either produced before the Board was aware of Witt's EEOC complaint, *see Johnson*, 137 F. App'x at 315, or it was produced too long after the

---

[321] Doc. no. 23-20 (Extra Assignment), at ECF 4.

Board received notice of the EEOC charge to be causally connected.  *See Brown*, 597 F.3d at 1182.

### 5.     Witt's classroom conditions

Witt's allegations regarding a quickly eliminated odor, the temporary lack of central heat, and the presence of black mold in the basement beneath her classroom all lack a causal connection with her protected activity, because those conditions arose in early December of 2010, four months after the Board received Witt's EEOC complaint.  The Eleventh Circuit repeatedly has held that such a delay between the protected activity and the adverse employment action is too long to establish a causal connection.  *See, e.g., Thomas*, 506 F.3d at 1364 (holding that a three-month period is not "very close"); *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) (finding that a three and one-half month period is too long).

### 6.     Witt's need to attend a make-up faculty meeting

Witt's absence from a faculty meeting on Tuesday, October 12, 2010, and her corresponding need to attend a make-up meeting the following Friday, were not materially adverse actions.  Although Principal Davis's knee-jerk reaction was to consider Witt's absence to be unexcused, and to suggest that disciplinary action would be forthcoming, she quickly corrected her statements after Witt informed her of the nature of her absence:  the need to drive her mother-in-law home, following her

74

discharge from the hospital.  In the end, Witt was not subjected to any disciplinary action, attended the Friday meeting without further incident, and was not reprimanded for missing the Tuesday meeting, which was counted as an excused absence.[322]

### 7.    Witt's student load

Witt's load of 150 students during the 2010-11 school year was neither a materially adverse action, nor causally connected to her EEOC complaint.  Her 2010-11 teaching load maintained the *status quo*:  she had the same number of students as in previous years, including the 2009-10 school year.[323]  It makes little sense to find that an employer took "adverse action" against an employee by maintaining the *status quo* after the employee filed an EEOC charge.  In other words, no reasonable employee would be deterred from making or supporting a charge of discrimination on the basis that her job duties remained unchanged.  *See Burlington Northern*, 548 U.S. at 68.

The fact that Witt had the same load of 150 students in prior years also suggests the absence of a causal connection between her student load and her EEOC complaint. That conclusion is bolstered by the fact that Witt received her schedule on August 3rd or 4th, the same day (or the day after) the Board received Witt's EEOC complaint.[324]

---

[322] Doc. no. 17-1 (Deposition of Resa Witt), at 155-58, 166-67.

[323] *Id.* at 171, 175, 183-84; doc. no. 17-2 (Exhibits to Deposition of Resa Witt), Ex. 15 (Emails of Aug. 8-9, 2010 between Resa Witt and Gary Williams), at ECF 27.

[324] Doc. no. 17-1 (Deposition of Resa Witt), at 176-77.

Hence, the Board either was not aware of Witt's EEOC charge until after the schedules were distributed, or was aware of the charge, but not in sufficient time to conduct the advance planning that would have been necessary to rearrange the various teacher and student schedules in order to assign more students to Witt. *See Hairston*, 9 F.3d at 919; *Farley*, 197 F.3d at 1337; *Pate*, 853 F. Supp. 2d at 1137.

### 8.    Discipline for Witt's students

Witt cannot establish a *prima facie* case with regard to the allegedly inadequate disciplinary sanctions imposed on her students, and the observation of her classroom by a superior in order to address further misbehavior.  She also has not shown that the reasons for observing her classroom were pretextual.  Because those events took place in November of 2010, and February and March of 2011, the incidents are not "very close" in time to Witt's EEOC complaint, and fall outside the period necessary to show a causal connection. *See Brown*, 597 F.3d at 1182; *Thomas*, 506 F.3d at 1364.

Assistant Principal Riddle also offered legitimate, nondiscriminatory reasons for observing Witt's classroom: *i.e.*, "to monitor the behavior of [students whom Witt accused of being disruptive] and to stop these students from hindering other students *and make it easier on* [*Witt*] *to teach the class*."[325]   Witt did not attempt to rebut

---

[325] Doc. no. 17-2 (Exhibits to Deposition of Resa Witt), Ex. 22 (Email of Feb. 18, 2011 from Darit Riddle to Resa Witt), at ECF 42 (alterations and emphasis supplied); *see also* doc. no. 17-1 (Deposition of Resa Witt), at 216-17.

Riddle's reasons in her brief, and admitted at her deposition that the in-class observation achieved the goal of quelling student misbehavior, at least in the short term.[326]

## V.  CONCLUSION

For all the foregoing reasons, defendant's motion to strike is due to be granted in part and denied in part.  Defendant's motion for summary judgment is due to be granted, and all claims dismissed with prejudice.  A separate order will be entered contemporaneously with this opinion.

DONE this 28th day of February, 2013.

United States District Judge

---

[326] *See* doc. no. 23 (Response Brief in Opposition to Summary Judgment), at 29-31; doc. no. 17-1 (Deposition of Resa Witt), at 221-22.